## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

FILED
CHARLOTTE, NC

JUN 2 8 2011

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES OF AMERICA, the )
States of CALIFORNIA, )
DELAWARE, FLORIDA, HAWAII, ILLINOIS )
INDIANA, MASSACHUSETTS, MINNESOTA )
MONTANA, NEVADA, NEW HAMPSHIRE )
NEW JERSEY, NEW MEXICO, NEW YORK )
NORTH CAROLINA, )
RHODE ISLAND, VIRGINIA, )
the DISTRICT OF COLUMBIA, )
the CITY of CHICAGO, and )
the CITY of New York )
　　　　　　　　　　　　　　　　　　　　)
**Plaintiffs,** ) **FILED UNDER SEAL pursuant to**
*Ex rel.* ) **31 U.S.C. § 3730(b)(2)**
　　　　　　　　　　　　　　　　　　　　)
LYNN E. SZYMONIAK, ) C.A. No. 3:10 cv 575
　　　　　　　　　　　　　　　　　　　　)
**Plaintiff-Relator,** ) **SECOND AMENDED**
　　　　　　　　　　　　　　　　　　　　) **COMPLAINT**
　　　　v. )
ACE SECURITIES CORPORATION )
ALLY FINANCIAL INC. f/k/a GMAC INC. )
AURORA LOAN SERVICES LLC )
BANK OF AMERICA as successor-in-interest to )
COUNTRYWIDE FINANCIAL CORPORATION )
BAC HOME LOANS SERVICING, LLP )
BANC OF AMERICA MORTGAGE SECURITIES,INC.)
BAYVIEW LOAN SERVICING LLC )
CALIFORNIA RECONVEYANCE COMPANY )
CARRINGTON MORTGAGE SERVICES )
CHASE HOME FINANCE )
CITIMORTGAGE INC f/k/a CITI RESIDENTIAL )
LENDING, INC. f/k/a )
AMC MORTGAGE SERVICES INC )
DOCX, LLC; )
HOMEQ SERVICING CORPORATION d/b/a )
BARCLAYS CAPITAL REAL ESTATE, INC. )
HSBC MORTGAGE SERVICES INC. )
LENDER PROCESSING SERVICES, INC.; )
LITTON LOAN SERVICING )
NATIONWIDE TITLE CLEARING )
OCWEN LOAN SERVICING )
ONEWEST BANK )

ORION FINANCIAL GROUP                          )
PROMMIS SOLUTIONS                              )
SECURITIES CONNECTION, INC.                    )
SELECT PORTFOLIO SERVICES, INC.                )
VERICREST FINANCIAL INC.                       )
WELLS FARGO HOME MORTGAGE d/b/a                )
AMERICA'S SERVICING COMPANY                    )
JOHN DOES CORPORATIONS 1 THROUGH 100)
All whose true names are unknown               )
                                               )
               **Defendants.**                 )
                                               )

**RICHARD A. HARPOOTLIAN P.A.**
Richard A. Harpootlian, Esq.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone:    (803) 252-4848
Facsimile:    (803) 252-4810

**JAMES, MCELROY & DIEHL, P.A.**
William K. Diehl, Jr.
600 South College Street
Charlotte, North Carolina  28202
Telephone:  (704) 372-9870
Facsimile:  (704) 333-5508

**GRANT & EISENHOFER P.A.**
Reuben Guttman, Esq.
1920 L Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:    (202) 386-9500
Facsimile:    (202) 350-5908

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer, Esq.
James J. Sabella, Esq.
Lydia Ferrarese, Esq.
485 Lexington Avenue
New York, NY 10017
Telephone:    (646) 722-8500
Facsimile:    (646) 722-8501

**JANET, JENNER & SUGGS, LLC**
Kenneth M. Suggs, Esq.
500 Taylor Street
Columbia, SC 29201
Telephone:    (803) 726-0050
Facsimile:    (410) 653-9030

**JANET, JENNER & SUGGS, LLC**
Howard Janet, Esq.
Woodholme Center
1829 Reisterstown Road, Suite 320
Baltimore, MD 21208
Telephone:    (410) 653-3200
Facsimile:    (410) 653-9030

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................. 1

II.  JURISDICTION AND VENUE ............................................................ 4

III.  PARTIES ............................................................................................. 5

    A.  Relator ....................................................................................... 5

    B.  Defendants ................................................................................ 5

IV.  BACKGROUND ................................................................................. 10

    A.  Real Estate Sale, Mortgage Finance and Foreclosure Procedures ..................... 10

    B.  Relator's Mortgage ................................................................... 11

    C.  Foreclosure Proceedings Against Relator ................................. 12

    D.  Relator Discovers a Forged Mortgage Assignment Filed in Her Foreclosure by DBNTC ...................................................... 13

    E.  Relator Reports Discovery of Mortgage Assignment Fraud to Authorities ......... 17

V.  THE MORTGAGE-BACKED SECURITIES MARKET ...................... 17

    A.  Mortgage-backed Securities Trusts and the Trustees' Role ................. 17

    B.  Mortgage-backed Securities Trusts, Controlled by the Trustee Bank Defendants Allegedly Purchased Notes and Mortgages on Homes in North Carolina and Across the United States ...................................... 19

    C.  The Foreclosure Problem in North Carolina and the United States ....................... 20

VI.  DEFENDANTS' ACTS VIOLATE THE FALSE CLAIMS ACT .................................. 22

    A.  False Corporate Officer Titles and Forged Signatures ......................... 25

        (a)  Georgia ...................................................................... 25

        (b)  Florida ....................................................................... 37

        (c)  Minnesota .................................................................. 39

(d) South Carolina ................................................................................. 46

B.     Mortgage Assignments Signed By Officers Of The Grantee
Fraudulently Identifying Themselves As Officers Of The Grantor ..................... 49

C.     Defendants' Use of Fake Documents, False Officer Titles, and
Forged Signatures Violates the Federal Lending Laws, and State
Mortgage Fraud and Notary Fraud Laws ............................................... 53

D.     Defendants' False Statements To The Investors ...................................... 56

VII.   THE U.S. GOVERNMENT PURCHASED MORTGAGE-BACKED
SECURITIES MADE UP OF MORTGAGES WITH MISSING OR
FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO
THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL
FINANCIAL HARM ...................................................................... 63

A.     Types of MBS ......................................................................... 64

B.     MBS Purchases by Federal Reserve Funding of Maiden Lane
Transactions ........................................................................... 64

C.     MBS Purchases by Treasury Financing of Public-Private Partnership
Funds .................................................................................. 69

D.     MBS Purchases by Federal Reserve and Treasury Direct Purchases ................. 72

E.     Damages to the U.S. Government ................................................... 73

(a) Impaired Value of MBS ....................................................... 73

(b) Overcharges for fraudulent services and services not provided .............. 74

(c) Fannie Mae and Freddie Mac ................................................ 74

(d) Federal Taxes From Trusts' Loss of Tax Status due to
Assignments Made After the Date of Trust Formation ................. 76

VIII.  THE STATE OF NORTH CAROLINA PURCHASED
MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES
WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING
BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL
FINANCIAL HARM ...................................................................... 77

IX.    THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, HAWAII, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, RHODE ISLAND, VIRGINIA, DISTRICT OF COLUMBIA, THE CITY OF CHICAGO AND THE CITY OF NEW YORK PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM ................................................................................ 79

X.    CAUSES OF ACTION ............................................................................ 82

COUNT I  Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
Against The Trustee Bank Defendants, the Depositor Defendants, Aurora, BAC, Bayview, CRC, Carrington, Citimortgage, Barclays, HSBC Mortgage, Litton Loan, NTC, Ocwen, Orion, Prommis, SCI, Select Portfolio, Vericrest, WELLS/ASC ................................................ 82

COUNT II  Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
Against The Trustee Bank Defendants, the Depositor Defendants, Aurora, BAC, Bayview, CRC, Carrington, Citimortgage, Barclays, HSBC Mortgage, Litton Loan, NTC, Ocwen, Orion, Prommis, SCI, Select Portfolio, Vericrest, WELLS/ASC ................................................ 84

COUNT III  Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(D)
Against all Defendants ........................................................................ 85

COUNT IV  Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
Against all Defendants ........................................................................ 87

COUNT V  Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
Against The Trustee Bank Defendants, the Depositor Defendants, Aurora, BAC, Bayview, CRC, Carrington, Citimortgage, Barclays, HSBC Mortgage, Litton Loan, NTC, Ocwen, Orion, Prommis, SCI, Select Portfolio, Vericrest, WELLS/ASC
For conspiracy to commit a violation of violation of
31 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(B)
And against all Defendants for conspiracy to commit a violation of
§ 3729(a)(1)(D), and § 3729(a)(1)(G). ....................................... 88

COUNT VI  North Carolina False Claims Act,
N.C. Gen. Stat. §§ 1-607(a)(1)-(a)(4),1-607 (a)(7)
Against all Defendants ........................................................................ 90

COUNT VII   California False Claims Act,
            Cal. Govt. Code §§ 12651(a)(1)- (a)(4), 12651(a)(7)-(a)(8)
            Against all Defendants ................................................................................ 92

COUNT VIII  Delaware False Claims Act,
            Del. Code Ann. Tit. 6,§§ 1201(a)(1)-(a)(4),1201(a)(7)
            Against all Defendants ................................................................................ 95

COUNT IX    District of Columbia False Claims Act,
            D.C. Code Ann. §§ 2-308.14 (a)(1)-(a)(4),2-308.14 (a)(7)-(a)(8)
            Against all Defendants ................................................................................ 97

COUNT X     Florida False Claims Act,
            Fla. Stat. Ann. §§ 68.082(2)(a)-(2)(d),68.081 (2)(g)
            Against all Defendants ................................................................................ 100

COUNT XI    Hawaii False Claims Act,
            Haw. Rev. Stat. §§ 661-21(a)(1)-(a)(4), 661-21(a)(7)-(a)(8)
            Against all Defendants ................................................................................ 102

COUNT XII   Illinois Whistleblower Reward and Protection Act,
            740 Ill. Comp. Stat. §§175/3 (a)(1)-(a)(4),175/3 (a)-(7)
            Against all Defendants ................................................................................ 104

COUNT XIII  Indiana False Claims and Whistleblower Protection Act,
            Ind. Code §§ 5-11-5.5-2(b)(1)-(b)(4), 5-11-5.5-2(b)(7)
            Against all Defendants ................................................................................ 106

COUNT XIV   Massachusetts False Claims Act,
            Mass. Ann. Laws Ch. 12, §§ 5(B)(1)-(B)(4),5(B)(8)
            Against all Defendants ................................................................................ 109

COUNT XV    Minnesota False Claims Act,
            Minn. Stat. §§ 15C.02(a)(1)-(a)(4),15C.02(a)(7)
            Against all Defendants ................................................................................ 111

COUNT XVI   Montana False Claims Act,
            Mont. Code Ann. §§ 17-8-403(1)(a)-(1)(d), 17-8-403(1)(g)-(h)
            Against all Defendants ................................................................................ 114

COUNT XVII  Nevada False Claims Act,
            Nev. Rev. Stat. §§ 357.040 (1)(a)- (1)(d),357.040 (1)(g)-(1)(h)
            Against all Defendants ................................................................................ 116

COUNT XVIII  New Hampshire False Claims Act,
    N.H. Rev. Stat. Ann. § 167:61-b(I)(a)-(I)(f)
    Against all Defendants ........................................................................ 119

COUNT XIX  New Jersey False Claims Act,
    N.J. Stat. §§ 2A:32 C-3(a)- (d);2A:32 C-3(g)  Against all Defendants ................. 121

COUNT XX  New Mexico False Claims Act,
    N.M. Stat. Ann. §§ 27-14-3 (A)(1)-(A)(4), 27-14-3(A)(7)-(A)(8)
    Against all Defendants ........................................................................ 123

COUNT XXI  New York False Claims Act,
    N.Y. State Fin. L. §§ 189.1.(a)-1.(d), 189.1.(g)  Against all Defendants .............. 126

COUNT XXII_Rhode Island False Claims Act,
    R.I. Gen. Laws§§ 9-1.1-3(a)(1)-(a)(4), 9-1.1-3(a)(7)
    Against all Defendants ........................................................................ 128

COUNT XXIII Virginia Fraud Against Taxpayers Act,
    Va. Code Ann. §§ 8.01-216.3 (A)(1)- (A-4), 8.01-216.3 (A)(7)
    Against all Defendants ........................................................................ 131

COUNT XXIV City of Chicago False Claims Act,
    Chicago Code of Ordinances §§ 1-22-020(1)-(4), 1-22-020(7)
    Against all Defendants ........................................................................ 133

COUNT XXV New York City False Claims Act,
    NYC Admin. Code §§ 7-803 (a)(1)-(a)(4), 7-803 (a)(7)
    Against all Defendants ........................................................................ 135

XI.      PRAYER FOR RELIEF ................................................................................ 137

XII.    REQUEST FOR A TRIAL BY JURY ............................................................ 139

Plaintiff/Relator Lynn E. Szymoniak ("Relator"), by and through her attorneys, James, McElroy & Diehl, P.A., Richard A. Harpootlian P.A., Grant & Eisenhofer P.A., and Janet, Jenner & Suggs, LLC, files this amended complaint against Defendants and alleges as follows:

## I.    INTRODUCTION

1.    This action is brought to recover damages and penalties arising from conduct by the defendants in creating, selling, and servicing securities allegedly backed by notes and mortgages respecting residential real estate when, in fact, the trusts that issued the securities did not possess the notes and assignments of the mortgages. When defendants needed to bring foreclosure actions they used fraudulent mortgage assignments to conceal that over 1400 mortgage-backed securities[1] trusts ("MBS Trusts"), each with mortgages valued at over $1 billion, are missing these critical mortgage assignments and notes. Without the notes and mortgage assignments, which should have been delivered at the inception of the trust, the trusts do not hold good title to the loans and mortgages that investors have been told secure the notes.

2.    The defendants named herein are (i) trustees which controlled the MBS Trusts whose assets consisted of pools of residential mortgages in North Carolina and throughout the United States, (ii) the mortgage servicing companies that managed the day-to-day operations of the payment processing and foreclosure proceedings at the

---

[1] According to the U.S. Securities and Exchange Commission ("SEC"): "Mortgage-backed securities are debt obligations that represent claims to the cash flows from pools of mortgage loans, most commonly on residential property. Mortgage loans are purchased from banks, mortgage companies, and other originators and then assembled into pools by a governmental, quasi-governmental, or private entity. The entity then issues securities that represent claims on the principal and interest payments made by borrowers on the loans in the pool, a process known as securitization." SEC, "Mortgage-Backed Securities" (June 25, 2007) (http://www.sec.gov/answers/mortgagesecurities.htm).

direction of the trustee banks, and (iii) the depositors that failed to convey to the trusts their rights and interest in each mortgage loan.

3.     Defendants concealed that the notes and assignments were never delivered to the MBS Trusts and disseminated false and misleading statements to the investors, including the United States ("U.S.") government, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia and North Carolina, District of Columbia, the City of Chicago and the City of New York.

4.     The U.S. government and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia and North Carolina, District of Columbia, the City of Chicago and the City of New York purchased securities issued by the MBS Trusts that used the defendants as depositors, trustees or servicers, and are missing notes and assignments, or include forged assignments. The U.S. government and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia and North Carolina, District of Columbia, the City of Chicago and the City of New York are harmed by: (i) the resulting impaired value of the purchased securities, (ii) overcharges for fraudulent services and for services not provided, imposed by the trustees and the mortgage service companies, and (iii) the increased costs to prove good title to the mortgages purportedly in their MBS' asset pools, since the supporting documents are missing or forged. The U.S. Government is further harmed by payments made on mortgage guarantees to Defendants lacking valid

notes and assignments of mortgages who were not entitled to demand or receive said payments.

5.    Pursuant to the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*[2] (the "FCA"), the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*, the States False Claims Act indicated herein, the Chicago False Claims Act, and the New York City False Claims Act,  Relator seeks to recover, on behalf of the United States of America, the State of North Carolina, the States of California,  Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York damages and civil penalties arising from the sale by Defendants of MBS, and other forms of asset-backed securities, using funds provided by the United States government, by the State of North Carolina and by the States of California, Delaware, District of Columbia, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, , the City of Chicago and the City of New York.

6.    Relator conducted her own investigations in furtherance of a False Claims Act *qui tam* action and found that the Defendants pursued and continue to pursue foreclosure actions using false and fabricated mortgage assignments.  Those fabricated documents were filed in courts throughout the United States. In many instances, Relator also found that the notes, representing the title to the mortgage, were never transferred to the Trusts, which never held good title to the mortgages.

---

[2] This action is brought pursuant to both (i) the FCA as it stood prior to the enactment of the Fraud Enforcement and Recovery Act of 2009 (the "FERA") and (ii) the FCA as amended by the FERA.

3

7.      When the depositors and the trustee banks discovered that the mortgage assignments were missing, the trustee banks, together with associated servicing companies, default management company and/or mortgage loan documentation companies, devised and operated a scheme to replace the missing assignments with fraudulent, fabricated assignments.  Likewise, to conceal that the Trusts were never assigned the notes, the trustee banks in concert with the  mortgage servicing companies, which needed possession of the note in order to foreclose, prepared affidavits falsely representing that the Trusts had possession of the note and that the note was lost in unknown circumstances and filed them in courts to pursue foreclosures.

8.      The purpose of this scheme was to meet the evidentiary requirements imposed by courts in the foreclosure cases, and to conceal from trust certificateholders the true, impaired value of the assets of each of the trusts, crippled by the missing documents.

9.      Furthermore, the MBS Trusts and their trustees, depositors and servicing companies misrepresented to the investing public the assets of the Trusts and issued false statements in their prospectuses and certifications of compliance.

## II.    JURISDICTION AND VENUE

10.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts related to the State False Claim Act pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over the Defendants pursuant to subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in this District of North

Carolina and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District of North Carolina.

12.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact the business that is the subject matter of this lawsuit in this District of North Carolina and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District of North Carolina.

## III.    PARTIES

### A.    Relator

13.    Relator Lynn E. Szymoniak brings this action on behalf of herself and the federal government pursuant to 31 U.S.C. §§ 3729-3733, and on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 1-605 *et seq.*. and on behalf of the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia pursuant to the respective State False Claims Acts as indicated herein, and the District of Columbia, City of Chicago and the City of New York pursuant to the False Claims Acts as indicated herein.

14.    Relator is an attorney specializing in white collar fraud in Palm Beach County, Florida. Relator resides and works in Palm Beach Gardens, Florida. Relator has direct and personal knowledge of the fraudulent scheme described herein.

### B.    Defendants

15.    Defendant ACE SECURITIES CORPORATION ("ACE") is a corporation formed under the laws of Delaware. ACE's headquarters is located at 6525 Blvd. Suite 318, Charlotte, NC 28211.

16.    Defendant ALLY FINANCIAL, INC. ("ALLY") is a corporation formed under the laws of the State of Delaware. ALLY's corporate headquarters is located at 200 Renaissance Center, P.O. Box 200 Detroit, Michigan. ALLY was formerly known as GMAC Inc.. As of December 30, 2009 the U.S. Treasury owned 56.3% of ALLY's common stock.

17.    Defendant AURORA LOAN SERVICES, LLC ("AURORA") is a corporation formed under the laws of the State of Delaware. AURORA's corporate headquarters is located at 10350 Park Meadows Drive, Littleton, Colorado.

18.    Defendant BANK OF AMERICA CORPORATION ("BA") is a corporation formed under the laws of the State of Delaware. BA's corporate headquarters is located at Bank of America Corporate Center, 100 North Tryon Street, Charlotte, North Carolina. BA is successor-in-interest to Countrywide Financial.

19.    Defendant BAC HOME LOANS SERVICING, LLP ("BAC") is a corporation formed under the laws of the State of Texas. BAC is a wholly owned subsidiary of defendant BA and was formerly known as Countrywide Home Loans Servicing LP. BAC operates from Arizona and from Texas and is based in 4500 Park Granada, Calabasis, CA 91302.

20.    Defendant BANC OF AMERICA MORTGAGE SECURITIES, INC. ("BAMS") is a corporation formed under the laws of the State of Delaware. BAMS' headquarters is located at 214 North Tryon Street, Charlotte NC 28255.

21.    Defendant BAYVIEW LOAN SERVICING, LLC ("BAYVIEW") is a corporation formed under the laws of the State of Delaware. BAYVIEW's headquarters is located at 4425 Ponce de Leon Blvd., 4th floor, Coral Gables FL 33146.

6

22.    Defendant CALIFORNIA RECONVEYANCE COMPANY ("CRC") is a corporation formed under the laws of the State of California. CRC's corporate headquarters is located at 9200 Oakdale Ave, Ste 100, Chatsworth, CA 91311.

23.    Defendant CARRINGTON MORTGAGE SERVICES ("CARRINGTON") is a corporation formed under the laws of the State of California. CARRINGTON's corporate headquarters is located at 1610 E. Saint Andrew Place, Suite B-150, Santa Ana, CA 92705.

24.    Defendant CHASE HOME FINANCE LLC ("CHASE HOME") is a corporation formed under the laws of the State of Delaware. CHASE HOME's corporate headquarters is located at 1211 Avenue of the Americas, New York, NY 10036-8701.

25.    Defendant CITIMORTGAGE, INC. f/k/a CITI RESIDENTIAL LENDING, INC. f/k/a AMC MORTGAGE SERVICES INC.("CITIMORTGAGE") is a corporation formed under the laws of the State of New York. CITIMORTGAGE'S headquarters is located at 1000 Technology Dr. O'Fallon MO, 63368.

26.    Defendant DOCX, LLC ("DOCX") is a limited liability company formed under the laws of the State of Georgia.  DOCX is a subsidiary of LPS as defined here below.  DOCX's principal place of business is located at 601 Riverside Avenue, Jacksonville, Florida.

27.    Defendant HOMEQ SERVICING CORPORATION d/b/a/ BARCLAYS CAPITAL REAL ESTATE, INC. ("BARCLAYS") is a corporation formed under the laws of the State of Delaware. BARCLAYS is a subsidiary of Barclays PLC. BARCLAYS' corporate headquarters is located at 4837 Watt Avenue, North Highlands, CA 95660. BARCLAYS operates from 301 S. College Street, Charlotte, NC 28202.

28.    Defendant HSBC MORTGAGE SERVICES Inc. ("HSBC MORTGAGE") is a corporation formed under the laws of the State of Delaware. HSBC MORTGAGE's principal place of business is 636 Grand Regency Blvd., Brandon, FL 33510.

29.    Defendant LITTON LOAN SERVICING LP ("LLS") is a corporation formed under the laws of Texas. LLS'S corporate headquarters is located at 4828 Loop Central DR, Houston TX 77081-2212.

30.    Defendant LENDER PROCESSING SERVICES, INC. ("LPS") is a corporation formed under the laws of the State of Delaware.  LPS' corporate headquarters is located at 601 Riverside Avenue, Jacksonville, Florida.

31.    Defendant NATIONWIDE TITLE CLEARING INC. ("NTC") is a corporation formed under the laws of Florida. NTC's corporate headquarters is located at 2100 ALTERNATE US 19 N,  North Palm Harbor, FL 34683.

32.    Defendant OCWEN LOAN SERVICING ("OCWEN") is a corporation formed under the laws of Florida. OCWEN's corporate headquarters is located at 1661 Worthington Road, Suite 100, West Palm Beach, FL.

33.    Defendant ONEWEST BANK ("ONEWEST") is a corporation formed under the laws of California. ONEWEST's corporate headquarters is located at 888 East Walnut Street, Pasadena, CA 91101.

34.    Defendant ORION FINANCIAL GROUP, Inc. ("ORION") is a corporation formed under the laws of Colorado. ORION's corporate headquarters is located at 8533 Church Ranch Blvd, #150, Bromfield, CO 80021-5541.

35.    Defendant PROMMIS SOLUTIONS LLC ("PROMMIS") is a corporation formed under the laws of Delaware. PROMMIS' corporate headquarters is located at

8

1544 Old Alabama Road, Atlanta GA 30076. PROMMIS has operations also in El Cajon, CA. PROMMIS' prior name was Mr. Default Services LLC.

36.    Defendant SECURITIES CONNECTION INC. ("SCI") is a corporation formed under the laws of Idaho. SCI's headquarters is located in Boise, ID.

37.    Defendant SELECT PORTFOLIO SERVICES INC ("SELECT PORTFOLIO") is a corporation formed under the laws of Utah. SELECT PORTFOLIO's headquarters is located at 3815 S. West Temple, Salt Lake City UT 84115.

38.    Defendant VERICREST FINANCIAL, INC. ("VERICREST") is a corporation formed under the laws of Delaware. VERICREST's corporate headquarters is located at 715 S Metropolitan Avenue, Oklahoma City, Oklahoma 73108. In 2009, Lone Star Funds acquired the home lending business platform of CIT Group Inc., including The CIT Group/Sales Financing, Inc., a Delaware corporation. Following the acquisition, the name of The CIT Group/Sales Financing, Inc. was changed to Vericrest Financial, Inc.

39.    Defendant WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY ("WELLS/ASC") is an operating unit of WellsFargo located at 3476 Stateview Blvd. Fort Mill, SC 29715.

40.    Upon information and belief, Defendants John Doe Corporations 1 through 100 are corporations the names and addresses of residence of which are unknown. Defendants John Doe Corporations include mortgage foreclosure servicing companies, depositors, and trustees of MBS Trusts.

41.    The defendants AURORA, BAC, BAYVIEW, CRC, CARRINGTON, CITIMORTGAGE, BARCLAYS, DOCX, HSBC MORTGAGE, LITTON LOAN, LPS,

9

NTC, OCWEN, ORION, PROMMIS, SCI, SELECT PORTFOLIO, VERICREST, WELLS/ASC, and the John Doe mortgage servicing companies are collectively referred to herein as the "Mortgage Servicing Defendants." The defendants ALLY, BA, CHASE HOME, ONEWEST and the John Doe trustee companies are collectively referred to herein as the "Trustee Bank Defendants." ACE, BAMS and the John Doe depositor companies are collectively referred to herein as the "Depositor Defendants." All of the defendants, described above, are collectively referred to herein as the "Defendants."

## IV.     BACKGROUND

### A.     Real Estate Sale, Mortgage Finance and Foreclosure Procedures

42.     This case began with Relator's purchase of a home in Florida financed with a mortgage followed by a subsequent foreclosure case based on forged documents. Relator's investigations revealed that Defendants' practices in this specific case occurred in numerous other cases, and tainted foreclosures nationwide.

43.     Generally, to finance the purchase and sale of real estate, the buyer borrows money from a bank or mortgage company. The borrower signs a promissory note secured by a mortgage on the property, which is recorded as a lien against the home. The note and mortgage are signed by the borrower and by an officer of the bank or mortgage company which originates the loan, *i.e.*, the lender.

44.     The lender records the mortgage as a lien against the property by filing a copy with the county recorder's office in the county in which the property is located. Any assignment of a note and mortgage from the lender to a purchaser is accomplished by a writing signed by the parties involved, which are often notarized or witnessed.

45.    A subsequent purchaser traditionally records its ownership of the note and mortgage by filing the assignment with the county recorder's office. But in the case of the mortgage-backed securities trusts, recording of the assignments rarely occurred.

46.    If the borrower defaults on the payments, the lender, or a new owner of the note and mortgage, can bring a foreclosure action in state court to obtain a court order for the auction of the property, and in this manner can receive payment on the loan by sale of the asset. In a foreclosure lawsuit, the plaintiff must prove that the property is subject to a note and mortgage, the plaintiff is the entity that lawfully owns the note and mortgage, and a default by non-payment occurred.

**B.    Relator's Mortgage**

47.    On or about April 30, 1998, Relator acquired a home on real property located at the address of 8268 Man O War Road, Palm Beach Gardens, Florida (the "Property"). On February 3, 2006, Relator refinanced her mortgage. ("Relator's Mortgage"). The lender was Option One.

48.    In accordance with the terms of the note, Relator made monthly mortgage payments of Four thousand eight hundred two dollars and 59/100 ($4,802.59) to Option One from February 2006 through April 2008.

49.    Relator's Mortgage was an adjustable rate mortgage. Pursuant to its terms, the rate could adjust only on the first day of March 2008, and on the first day of the month every six months thereafter, provided the mortgage company gave written notice of the adjustment.

50.    Option One did not adjust the interest rate on Relator's Mortgage on March 1, 2008. Instead, in violation of the terms of the note, on March 31, 2008, Option One

raised the rate to 8.125%, thus increasing the monthly payment to Five thousand seven hundred forty dollars and 65/100 ($5,740.65).

51.    Relator promptly disputed the adjustment as a violation of the terms of the note but Option One never responded.  On April 25, 2008, under protest and to advance negotiations, Relator made one payment at the higher rate, including a disputed late charge of Three hundred forty-four and 44/100 ($344.44) incorrectly imposed by Option One, for a total payment of Six thousand eighty-five and 9/100 ($6,085.09).  Through July 2008, Relator continued to dispute with Option One the increased rate, but to no avail.

### C.    Foreclosure Proceedings Against Relator

52.    In July 2008, without any prior notice, a real property foreclosure action was filed against Relator, titled, DEUTSCHE BANK NATIONAL TRUST COMPANY ("DBNTC") as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT2, Asset-backed Certificates, Series 2006-OPT2  v. Lynn Szymoniak, case number 50-2008-ca-022258 (Circuit Court, Palm Beach County, Florida)("Relator's Foreclosure"), to foreclose on the Property.

53.    The action was commenced by DBNTC.  DBNTC's complaint alleged that DBNTC owned the note originally made to Option One on February 3, 2006, for $780,000; that it had possession of the note at some time, but that the original note was lost or destroyed, "the exact time and manner of said loss or destruction being unknown" but that it was entitled to enforce the original note; and that Relator was in default.  As of January 2011, Relator's Foreclosure remains pending.

54.    In Relator's Foreclosure, DBNTC attached to the complaint a copy of the original mortgage to Option One, but did not attach any documents that proved that a

mortgage-backed securities trust had acquired Relator's Mortgage, nor did it make any specific allegations regarding the acquisition of the note and mortgage by DBNTC. The Relator first learned that Relator's Mortgage had allegedly been acquired by Soundview Home Loan Trust 2006-OPT2 ("Soundview Trust") when she was served with the complaint for foreclosure. DBNTC's complaint alleges that DBNTC acts as the trustee for the Soundview Trust.

55.    Soundview Trusts' prospectus, disseminated to the investors, represented that it held good title to the mortgages bundled into the mortgage-backed securities, including Relator's Mortgage, and that it possessed the executed assignments transferring the notes and mortgages from the originating lender to the Soundview Trust.

56.    In reality, Soundview Trust did not hold the original assignments of the notes and mortgages.

### D.    Relator Discovers a Forged Mortgage Assignment Filed in Her Foreclosure by DBNTC

57.    After the filing of Relator's Foreclosure, in August 2008 Relator's attorney in that action filed a Motion to Dismiss, based on DBNTC's lack of standing because DBNTC did not possess any title to Relator's note or mortgage. No assignment was produced, or filed and recorded. Indeed, DBNTC alleged that the mortgage and promissory note had been lost or destroyed in an unknown manner.

58.    To cure the deficiencies of its initial allegations, in December 2009, DBNTC, through its attorneys, the Law Offices of Marshall C. Watson, P.A., filed in Relator's Foreclosure a Notice of Filing, attaching copies of three allegedly *bona fide* documents, as follows: (1) a copy of the note (previously alleged to have been lost or

destroyed); (2) an allonge;[3] and (3) a mortgage assignment. The mortgage assignment document DBNTC filed with the Circuit Court is a forgery.

59. Relator discovered the forgery upon inspection and analysis and through her own investigations. First, the document, entitled, "Assignment of Mortgage," bears an execution date of October 28, 2008, months after the filing of Relator's Foreclosure. The grantor is "American Home Mortgage Servicing Inc. as successor-in-interest to Option One Mortgage Corporation," and the grantee is "Deutsche Bank National Trust Company as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT2, Asset-backed Certificates, Series 2006-OPT2." Two individuals, Linda Green and Jessica Ohde, sign as "vice president" of "American Home Mortgage Servicing Inc. as successor-in-interest to Option One Mortgage Corporation." Two individuals, Korell Harp and Christina Huang, sign as witnesses. As described below, Relator's investigation showed that Linda Green and Jessica Ohde were not employed by American Home Mortgage Servicing, Inc., and did not have any authority whatsoever to sign the document. Instead, they were employees of the servicing company Lender Processing Services ("LPS"), or its subsidiary, DOCX, and were part of a larger team, who were producing a vast number of forged mortgage assignments for use in foreclosure cases across the United States. The purported signatures of Linda Green and Jessica Ohde on the mortgage assignment submitted in Relator's Foreclosure were likely made by various other people, as Relator's comparison of their various forged mortgage assignments

---

[3] An "allonge" is defined as "[a] piece of paper annexed to a bill of exchange or promissory note, on which to write endorsements for which there is no room on the instrument itself." BLACK'S LAW DICTIONARY 70 (5th ed. 1979).

makes clear. The purported witness signatures were also forged, Relator's analysis shows.

60.    Affixing or submitting false signatures on a mortgage document is a violation of federal and state law, and those signatures are without authority to complete the transaction. According to a mortgage fraud notice prepared jointly by the Federal Bureau of Investigation and the Mortgage Bankers Association, submitting false mortgage assignments and forging signatures violates potentially eight federal criminal statutes. Specifically: (1) 18 U.S.C. § 1001 - Statements or entries generally; (2) 18 U.S.C. § 1010 - HUD and Federal Housing Administration transactions; (3) 18 U.S.C. § 1014 - Loan and credit applications generally; (4) 18 U.S.C. § 1028 - Fraud and related activity in connection with identification documents; (5) 18 U.S.C. § 1341 - Frauds and swindles by mail; (6) 18 U.S.C. § 1342 - Fictitious name or address; (7) 18 U.S.C. § 1343 - Fraud by wire; and (8) 18 U.S.C. § 1344 - Bank Fraud. *See* FBI Mortgage Fraud Notice (*available at* http://www.mbaa.org/FBIMortgageFraudWarning.htm); *see, also,* Truth in Lending Act, title I of the Consumer Credit Protection Act, as amended, 15 U.S.C. § 1601 *et seq.*; Florida Statutes 817.545, Mortgage fraud (penalty is a felony of the third degree).

61.    False or fraudulent notary acknowledgements are also a violation of Florida law, and the underlying signature is void. Florida Statute 117.05, False or fraudulent acknowledgements (penalty is a felony of the third degree).

62.    The signatures contained on the assignments filed in Relator's Foreclosure are fraudulent, in violation of federal and Florida law, and do not serve to assign the note and mortgage to DBNTC. Therefore, DBNTC lacks any authority to act on Relator's

note and mortgage, is not a true party in interest in Relator's Foreclosure, and cannot prosecute the foreclosure.

63.    DBNTC may prove unable to establish title or will expend significant funds in an effort to prove its allegations that it is the lawful owner of Relator's Mortgage since DBNTC lacks any supporting documents.  The amount DBNTC will expend to prove its ownership is materially more than DBNTC would have spent if it had complied with the procedures described in the Soundview Trust prospectus, or had presented truthful documents to the Circuit Court in Relator's Foreclosure.

64.    As in a single case, the cost for DBNTC to establish it is the owner of Relator's Mortgage is a financial harm for the owners of the Soundview Trust securities, so, too, more widely, in foreclosure cases in North Carolina around the United States the costs to foreclose are higher without any supporting documents.  In each foreclosure case, the U.S. government and the States of North Carolina, California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York as purchasers of MBS with missing or forged assignments are financially harmed by the impaired value of the securities that they purchased and by the Defendant Trustee Banks' inability, or excessive expenditures, to prove good title to the mortgages purportedly in their MBS' asset pools, since the supporting documents are missing or forged.

65.    Through her investigations Relator uncovered a wide spread pattern and practice of forging documents. Relator's investigation was prompted as a result of defending her own foreclosure.

66.     Since at least 2007, Defendants have known of the significant and serious problems in the Missing Mortgage Assignments Trusts ("MMA Trusts"), but have failed to disclose these problems and, instead, have actively concealed these issues from the SEC, and the investors, including the U.S. government, the State of North Carolina, California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York.

### E.     Relator Reports Discovery of Mortgage Assignment Fraud to Authorities

67.     In December 2009, Relator began reporting her findings of widespread fabricated mortgage assignments used by mortgage-backed securities trusts to the: (1) Federal Deposit Insurance Corporation; (2) U.S. House of Representatives, Financial Oversight Committee, and its Housing and Community Opportunity Subcommittee; (3) Financial Crisis Oversight Commission; (4) U.S. Attorney for the Middle District of Florida; (5) State Attorney for Palm Beach County, Florida; and (6) various Florida Court Clerks, among others.

68.     Upon information and belief, Relator's findings communicated to the FBI Special Agent in Jacksonville, Florida resulted in an investigation.

## V.     THE MORTGAGE-BACKED SECURITIES MARKET

### A.     Mortgage-backed Securities Trusts and the Trustees' Role

69.     Although relatively unknown and unused prior to 2004, MBS trusts held approximately one-third of all residential mortgages in the United States by the end of 2009.

17

70.    Such trusts hold a pool of approximately 5,000 residential mortgages, with notes, with a stated value of $1.5 to $2.5 billion in each trust.

71.    These trusts are each governed by Pooling & Servicing Agreements establishing the duties of various entities involved in the creation and operation of the trust.

72.    One of the most significant duties of the trustee is the conveyance of the mortgages and notes from the original lenders to the depositor, then to the trust. This conveyance is done via mortgage assignments.

73.    The trusts represent to purchasers of their securities that the notes and mortgages (bundled to form the asset pool of the trust) will be delivered with assignments to the trust in recordable form, so that they will be able to foreclose on the assets in the event of default.

74.    Despite the trusts' representations, in many trusts the assignments of the notes and mortgages were not delivered at all to the trustee or, if delivered, were allegedly lost or misplaced.

75.    The Trustees, the Depositors and the Servicers of the MBS Trusts routinely provided certifications of compliance, falsely asserting that they had fulfilled their obligations as mandated by the Securities and Exchange Commission ("SEC") Regulation AB and by the prospectuses and the pooling and servicing agreements.

76.    Without the assignments, the value of the assets in the trust is severely diminished because the trustee is unable to establish clear chain-of-title to pursue a foreclosure action. The trust usually turned to a "lost note affidavit" procedure to assert ownership. Faced with an increasing number of inaccuracies in foreclosure cases, courts

have increasingly established minimum evidentiary standards requiring more than a lost note affidavit. Rather than pursuing the proper procedure for obtaining valid assignments, the Defendants have filed forged mortgage assignments in court to support their foreclosure cases.

**B.    Mortgage-backed Securities Trusts, Controlled by the Trustee Bank Defendants Allegedly Purchased Notes and Mortgages on Homes in North Carolina and Across the United States**

77.    The MBS trusts, controlled by the Trustee Bank Defendants were created, packaged and sold between 2004 and 2009, during the rapid expansion of the MBS industry.

78.    Relator's investigations revealed that between 2004 and 2009, the MBS trusts, controlled by the Trustee Bank Defendants, allegedly acquired notes and mortgages for homes in North Carolina, and across the United States.

79.    Notes and mortgages on homes located in North Carolina are identified as assets in the prospectus of the MBS trusts controlled by the Trustee Bank Defendants, which used fabricated mortgage assignments. The prospectus specifies the location by state of the homes subject to the notes and mortgages acquired by the trusts and includes properties for which foreclosures with forged assignments are pending. For example, North Carolina properties are included in a MBS Trust created in 2007 named "Merrill Lynch First Franklin Mortgage Loan Trust/Series 2007-1" with Defendant BA as Trustee, and with companies affiliated to Merrill Lynch, now affiliated with Defendant BA, as both Depositor and Servicer. A review of the prospectus further shows that this MBS Trust contains a total of 374 North Carolina homes, with a principal aggregate value of $54.5 million. Similarly, North Carolina properties are included in a MBS Trust created in 2007 named "First Franklin Mortgage Loan Trust/Series 2007-FF1" with Defendant

19

BA as Trustee, and with companies affiliated to Merrill Lynch, now affiliated with

Defendant BA, as both Depositor and Servicer. A review of the prospectus indicates that

the MBS Trust includes 383 North Carolina homes, with a principal aggregated value

greater than $56 million. These filings, as well as numerous other filings of MBS Trusts

in which Defendants were involved, show that Defendants' fraudulent practices spread

widely in North Carolina.

### C.    The Foreclosure Problem in North Carolina and the United States

80.    The foreclosure problem is substantial.  North Carolina's Administrative

Office of the Courts calculates that nearly 53,000 foreclosures started in the state through

the end of September 2010.[4]

81.    According to data compiled by the Federal Reserve Bank of Richmond, in

the second quarter of 2010, North Carolina has 10.57% of its subprime mortgages in

foreclosures and 12.77% over 90 days past due. Anne Davlin *et al.*, "Quarterly Report:

Housing Market and Mortgage Performance in Maryland and the District of Columbia,"

The Federal Reserve Bank of Richmond, at 7 (April 2010)

(http://www.richmondfed.org/community_development/resource_centers/foreclosure/rese

arch_and_pubs/mortgage_performance_summaries/md_dc/pdf/mortgage_performance_m

ddc_20102q.pdf ). In the third quarter of 2010, subprime mortgages continue to make up

25.8 percent of the foreclosure inventory in North Carolina. See Anne Davlin *et al.*,

"Quarterly Update: Housing Market and Mortgage Performance in North Carolina" The

Federal Reserve Bank of Richmond, at 1

(http://www.richmondfed.org/community_development/resource_centers/foreclosure/rese

---

[4] See http://www.charlotteobserver.com/2010/10/31/1799908/how-foreclosure-process-works.html#ixzz1443YkELD.

arch_and_pubs/mortgage_performance_summaries/nc/pdf/mortgage_performance_nc_20
103q.pdf).

     82.    The Officer of the Commissioner of Banks for the State of North Carolina

reports that in 2008 there were 3.1 million foreclosure filings in North Carolina, an

increase of 81% compared to the prior year. By 2012, according to the estimate of the

Officer of the Commissioner of Banks for the State of North Carolina, foreclosures will

reach 8 million. The report further indicates that, as of 2008, 20% of subprime loans were

seriously delinquent and almost 50% were delinquent. In 2008, subprime loan

delinquencies increased 39% in North Carolina.[5]

     83.    Studies show that North Carolina had 15 percent more subprime home

loans *per capita* than the national average in 2000 and that low-income borrowers in

North Carolina received a higher proportion of subprime to prime loans in 2000 than low-

income borrowers in any other state.[6]

     84.    The problems in North Carolina reflect a national trend. On May 10, 2010,

*Bloomberg* reported: "Bank repossessions in the U.S. rose 35 percent in the first quarter

from a year earlier to a record 257,944, according to RealtyTrac Inc." Brian Louis,

"Mortgage Holders Owing More Than Homes Are Worth Rise to 23%," *Bloomberg*, May

10, 2010 (http://www.bloomberg.com/news/2010-05-10/u-s-mortgage-holders-owing-

more-than-homes-are-worth-rise-to-23-of-total.html).

     85.    The size of the foreclosure problem is growing, with "the 1.8 million

foreclosures already tallied in the first half of this year by Equifax and Moody's

---

[5] The report is available at http://www.nccob.org/NR/rdonlyres/2FA43003-8ADA-42B2-B822-
ABAE0E4E99A2/0/NCHouseFJMortgageMarch2009.pdf.
[6] See Working Paper "Housing Default: theory works and so does policy," by A. Goodman et al. at 6,
available at http://www.richmondfed.org/publications/research/working_papers/2010/pdf/wp10-10.pdf.

Economy.com, and by projections for 3 million to 4 million foreclosures over two years."
Elise Craig, "Mortgage Modifications Can't Catch Foreclosures," *BusinessWeek*, Aug. 4,
2009
(http://www.businessweek.com/bwdaily/dnflash/content/aug2009/db2009084_229370.ht
m).

86.    Other sources suggest that as many as five to six million homes will end up
in foreclosure beyond the number already seized.  Dan Levy, "U.S. Home Seizures Reach
Record as Recovery Delayed," *Bloomberg*, May 13, 2010 ("About 5 million delinquent
loans will probably end up in the foreclosure process in addition to the 1.2 million homes
already taken back by lenders, Sharga said.") (http://www.bloomberg.com/news/2010-
05-13/foreclosures-in-u-s-rise-to-record-in-signal-seizures-won-t-drop-off-soon.html ).

87.    The Federal Reserve Bank of New York states that it "considers the record
rate of mortgage delinquencies, foreclosures and their impacts on communities an urgent
problem." The Federal Reserve Bank of N.Y. (2010)
(http://data.newyorkfed.org/creditconditionsmap/).

## VI.    DEFENDANTS' ACTS VIOLATE THE FALSE CLAIMS ACT

88.    Defendants created mortgage-backed securities lacking lawful assignments
of the notes and mortgage to the trusts, and then forged the missing assignments by
having employees or agents of the servicing company LPS and the Mortgage Servicing
Defendants, on behalf of the Defendants, sign using false corporate officer titles, false
dates of assignment, and forged signatures.

89.    By 2008, at the latest, the Trustee Bank Defendants and the Depositor
Defendants knew, or reasonably should have known, that the requisite mortgage
assignments were lost, or had never been delivered, for the MBS sold to the U.S.

government and to the State of North Carolina and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York.

90.    By 2008, at the latest, the Trustee Bank Defendants and the Depositor Defendants knew, or reasonably should have known, that foreclosure cases with missing assignments would draw the scrutiny of courts or would not be accepted by the courts, preventing foreclosure, or increasing the costs substantially by requiring document custodian witnesses to testify in court. The trusts bear the higher procedural costs of the foreclosures and thus the value of the trusts' securities is materially diminished.

91.    Rather than disclose that the assignments were missing for many trusts, the Defendants embarked on a plan to forge assignments to comply with the evidentiary standards of the courts in foreclosure cases and to conceal to the investor the current value of their investments.

92.    The Depositor Defendants and the Trustee Bank Defendants directed the Mortgage Servicing Defendants to prepare and file forged mortgage assignments to replace the missing assignments.

93.    After discovering the forged mortgage assignment in Relator's Foreclosure, Relator investigated thousands of mortgage assignments prepared by the mortgage servicer defendant DOCX and by the Mortgage Servicing Defendants and found the same forged assignments in all of these cases.

94.    In her investigation, Relator examined similar assignments prepared by the mortgage servicing company, defendant LPS and filed throughout the United States,

23

including North Carolina. Relator found that the forgeries were also created in LPS's offices in Dakota County, Minnesota, and in Jacksonville, Florida. Ironically, LPS claims on its Web site as follows: "Our full service, integrated solution eliminates errors and delays that can come from employing multiple title companies, while providing seamless service and consistent quality control throughout the entire default cycle." Relator further examined assignments prepared by certain of the law firms used by LPS in its default management processes and found that, in many cases, the law firm employees were signing as officers of grantors, without any authority or power of attorney, so that certain trusts could foreclose. These assignments, as all the others that Relator had examined, had the same, or similar, false information regarding transfer of ownership to the trust as the assignments prepared in the other offices of LPS. Moreover, Relator found that the law firm employees signed as officers of an industry database, called the Mortgage Electronic Registration Systems, Inc. ("MERS"),[7] without disclosing that they were associates or support staff in the foreclosing law firms.

95.    Employee or agents of Defendant BARCLAYS who created, or participated in creating, fraudulent assignments in North Carolina include: (1) Robert V. Burton, (2) John Hollstien, (3) Arthur Q. Lyon, (4) Mark Metz and (5) Carol R. Mullis.

96.    The employees or agents of Defendants, and LPS, and/or its subsidiary, DOCX, who participated in the fraudulent assignments mainly recorded in North Carolina include (i) the officers based in the State of **SOUTH CAROLINA**: (1) John

---

[7] Mortgage Electronic Registration Systems, Inc. ("MERS") operates a computer database designed to track servicing and ownership rights of mortgage loans in the United States. *See* "Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic System" by Christopher L. Peterson, University of Cincinnati Law Review, vol. 78, No.4, Summer 2010. MERS is a registry, but never held physical copies of the notes and mortgages.

Kennerty; (2) Nicki Cureton; (3) China Brown; (4) Heather Carrico; (5) Elizabeth

Mathis; (6) Anita Antonelli, (7) Natasha Clark, and (8) Joseph Kaminski;[8] (ii) the

officers based in **GEORGIA**: (9) Linda Green; (10) Korell Harp; (11) Linda Thoresen;

(12) Tywanna Thomas; (13) Jessica Ohde; (14) Brittany Snow; (15) Lorraine O'Reilly

Brown; (16) Ron Meharg; (iii) the officers based in **FLORIDA**: (17) Michelle Halyard,

(18) Kathy Smith; (19) Cynthia Stevens; (20) Joseph Kaminski; and (iv) the officers

based in **MINNESOTA**: (21) Greg Allen; (22) Liquenda Allotey; (23) Alfonzo Greene;

(24) Topako Love; (25) Christina Allen; (26) John Cody, (27) Laura Hescott,  (28) Eric

Tate, (29) Bethany Hood, (30) Cecilia Knox, (31) Becky North, (32) Jodi Sobotta, (33)

Rick Wilken, and others, as detailed below.

### A.    False Corporate Officer Titles and Forged Signatures

97.    After examining the forged mortgage assignment filed in Relator's own

foreclosure, including the signatures of "Linda Green" and "Jessica Ohde," Relator

located numerous other examples of assignments signed by those names.  Relator also

located other examples of documents signed by the same witnesses, "Korell Harp" and

"Christina Huang."  Indeed, Relator discovered a number of forgeries using the signature

of Linda Green, and others.  The results of Relator's investigation are described below.

### (a)    Georgia

98.    The name "Linda Green" appears on over 100,000 mortgage assignments

prepared by DOCX and filed throughout the United States, including North Carolina.  On

these assignments, Green signs as an officer of the grantor but she was, in reality, just an

employee of DOCX.

---

[8] Joseph Kaminski is an employee of LPS based in Jacksonville, Florida.

99.    On DOCX-prepared mortgage assignments, at least 18 different job titles are listed for Linda Green, with different titles assigned to Green even on the same day. Titles attributed to Green include the following:

- Vice President, Loan Documentation, Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for HLB Mortgage;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Family Lending Services, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for AIIM Mortgage;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President & Asst. Secretary, American Home Mortgage Servicing, Inc., as servicer for Ameriquest Mortgage Corporation;

- Vice President, Option One Mortgage Corporation;

- Vice President, American Home Mortgage Servicing, Inc.;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President, Argent Mortgage Company, LLC by Citi Residential Lending Inc., attorney-in-fact;

- Vice President, Sand Canyon Corporation f/k/a Option One Mortgage Corporation;

- Vice President of Optimum Mortgage Group LLC by Sand Canyon Corporation f/k/a Option One Mortgage Corporation as Attorney-in-Fact;

- Vice President of Deutsche Bank National Trust Company, as Trustee for the Certificateholders of Soundview Home Loan Trust 2006-OPT1, Asset-Backed Certificates, Series 2006-OPTI;

- Vice President, Amtrust Funsing (sic) Services, Inc., by American Home Mortgage Servicing, Inc. as Attorney-in-fact; and

- Vice President, Seattle Mortgage Company.

100. The use of so many different corporate titles for Linda Green shows it is unlikely that she was actually the officer of any of the named companies; Linda Green lacked corporate authority to sign the documents of behalf of the companies.

101. Further, Linda Green did not sign all of the documents to which her name is affixed. At least eight different persons have signed on the DOCX-prepared assignments. Likewise, so many people signed mortgage assignment documents using her name, Linda Green, that the notarization of those signatures is clearly unreliable, and fraudulent.

102. Similarly, the name "Korell Harp" appears on over 100 mortgage assignments prepared by DOCX. On these assignments, Harp signs as an officer of the grantor.

103. On DOCX-prepared mortgage assignments, at least 14 different job titles are listed for Korell Harp, with different titles assigned to Harp on the same day. Titles attributed to Harp include the following:

- Vice President, American Brokers Conduit;

- Vice President, American Home Mortgage Acceptance, Inc.;

- Vice President, American Home Mortgage Servicing, Inc.;

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

27

- Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Vice President, Option One Mortgage Corporation;

- Vice President & Asst. Secretary, Argent Mortgage Company, LLC by Citi Residential Lending, Inc., as Attorney in Fact;

- Vice President, J.S. Shirk and Associates, Inc. by American Home Mortgage Servicing, Inc., as Attorney-In-Fact;

- Vice President, Mortgage Electronic Registration Systems, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage;

- Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as a nominee for HLB Mortgage; and

- Vice President, Sand Canyon Corporation, f/k/a Option One Mortgage.

104.    The use of so many different corporate titles for Korell Harp shows it is unlikely that he was actually the officer of any of the named companies; Korell Harp lacked corporate authority to sign the documents on behalf of the companies.

105.    Further, Korell Harp did not sign all of the documents to which his name is affixed. At least five different persons have signed the name Korell Harp on the DOCX-prepared assignments. Likewise, so many people signed mortgage assignment documents using his name, Korell Harp, that the notarization of those signatures is clearly unreliable, and fraudulent.

106. The name "Linda Thoresen" appears on over 100 mortgage assignments prepared by DOCX. On these assignments, Thoresen signs as an officer of the grantor.

107. On DOCX-prepared mortgage assignments, at least six different job titles are listed for Linda Thoresen, with different titles assigned to Thoresen on the same day. Titles attributed to Thoresen include the following:

- Asst. Vice President, American Home Mortgage Acceptance, Inc.;

- Asst. Vice President, American Home Mortgage Servicing, Inc. as successor-in-interest to Option One Mortgage Corporation;

- Asst. Secretary, Mortgage Electronic Registration Systems, Inc.;

- Asst. Secretary, Mortgage Electronic Registration Systems, Inc. as nominee for American Brokers Conduit;

- Asst. Secretary, Mortgage Electronic Registration Systems, Inc. as nominee for American Home Mortgage Acceptance, Inc.; and

- Asst. Vice President, Mortgage Electronic Registration Systems, Inc. acting solely as a nominee for Lenders Direct Capital Corporation.

108. The use of so many different corporate titles for Linda Thoresen shows it is unlikely that she was actually the officer of any of the named companies; Linda Thoresen lacked corporate authority to sign the documents of behalf of the companies.

109. Further, Linda Thoresen did not sign all of the documents to which her name is affixed. At least three different persons have signed the name Linda Thoresen on the DOCX-prepared assignments. Likewise, so many people signed mortgage assignment documents using her name, Linda Thoresen, that the notarization of those signatures is clearly unreliable, and fraudulent.

110. The name "Tywanna Thomas" appears on over 100 mortgage assignments prepared by DOCX. On these assignments, Thomas signs as an officer of the grantor.

29

111.  On DOCX-prepared mortgage assignments, at least 21 different job titles are listed for Tywanna Thomas, with different titles assigned to Thomas even on the same day.  Titles attributed to Thomas include the following:

- Assistant Vice President, American Home Mortgage;

- Assistant Vice President, American Home Mortgage Acceptance, Inc.;

- Assistant Vice President, American Home Mortgage Servicing, Inc.;

- Vice President & Assistant Secretary, American Home Mortgage Servicing, Inc., as servicer for Ameriquest Mortgage Company;

- Vice President & Assistant Secretary, American Home Mortgage Servicing, Inc., as servicer for Argent Mortgage Company, LLC;

- Assistant Vice President, American Home Mortgage Servicing, Inc as successor-in-interest to Option One Mortgage Corporation;

- Vice President & Assistant Secretary, Argent Mortgage Corporation, LLC by Citi Residential Lending, Inc., as Attorney in Fact;

- Assistant Vice President, Deutsche Bank National Trust Company as Indenture Trustee for American Home Mortgage Investment Trust 2005-2 Mortgage-Backed Notes, Series 2005-2 by American Home Mortgage Servicing, Inc, as Attorney-in-Fact;

- Vice President & Assistant Secretary, Inc., as servicer for Deutsche Bank National Trust Company, as trustee for, Ameriquest Mortgage Securities, Inc., asset-backed pass-through certificates, series 2004-R7, under the pooling and servicing agreement dated July 1, 2004;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc.;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for American Home Mortgage;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., as nominee for American Home Mortgage Acceptance, Inc.;

30

- Assistant Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Family Lending Services, Inc.;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as a nominee for HLB Mortgage;

- Assistant Vice President, Mortgage Electronic Registration Systems, Inc., as nominee for Homestar Mortgage Lending Corp.;

- Assistant Vice President, Mortgage Electronic Registration Systems, Inc., A Separate Corporation that is acting solely as Nominee for Lender and Lender's successors and assigns [Beckman Mortgage Corporation];

- Assistant Vice President, Nationwide Home Loans, Inc, by American Home Mortgage Servicing, Inc., as Attorney-In-Fact;

- Assistant Vice President, Option One Mortgage Corporation;

- Assistant Vice President, Sand Canyon Corporation f/k/a Option One Mortgage Corporation; and

- Assistant Vice President, Wells Fargo Bank, N.A., as Trustee for First Franklin Mortgage Loan Trust 2002-FF1, Asset-Backed Certs., Series 2002-FF1.

112. The use of so many different corporate titles for Tywanna Thomas shows it is unlikely that she was actually the officer of any of the named companies; Tywanna Thomas lacked corporate authority to sign the documents of behalf of the companies.

113. Further, Tywanna Thomas did not sign all of the documents to which her name is affixed. At least three different persons have signed the name Tywanna Thomas on the DOCX-prepared assignments. Likewise, so many people signed mortgage assignment documents using her name, Tywanna Thomas, that the notarization of those signatures is clearly unreliable, and fraudulent.

114. The name "Jessica Ohde" appears on over 100 mortgage assignments prepared by DOCX. On these assignments, Ohde signs as an officer of the grantor.

115.   On DOCX-prepared mortgage assignments, at least six different job titles are listed for Jessica Ohde, with different titles assigned to Ohde even on the same day. Titles attributed to Ohde include the following:

- Assistant Vice President, American Home Mortgage Servicing, Inc.;

- Assistant Vice President, American Home Mortgage Servicing, Inc., as successor-in-interest to Option One Mortgage Corporation;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., as nominee for American Brokers Conduit;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominees for American Home Mortgage;

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominees for American Home Mortgage Acceptance, Inc.; and

- Vice President, Seattle Mortgage.

116.   The use of so many different corporate titles for Jessica Ohde shows it is unlikely that she was actually the officer of any of the named companies; Jessica Ohde lacked corporate authority to sign the documents of behalf of the companies.

117.   Further, Jessica Ohde did not sign all of the documents to which her name is affixed. At least three different persons have signed the name Jessica Ohde on the DOCX-prepared assignments. Likewise, so many people signed mortgage assignment documents using her name, Jessica Ohde, that the notarization of those signatures is clearly unreliable, and fraudulent.

118.   Other individuals who misrepresented themselves to be bank officers or mortgage company officers on mortgage assignments prepared by DOCX, who were actually clerical employees of DOCX, also include: (1) Brent Bagley, (2) Christie Baldwin, (3) Christina Huang and (4) Shelly Scheffey. There are such significant

variations in the signatures of these individuals that it is very likely that some of these signatures were also forged. So many people signed mortgage assignment documents using those names, the notarization of those signatures is unreliable, and fraudulent.

119. Many of the mortgage assignments prepared by DOCX have a customer code indicated, in the left-hand corner of the document, under the address information. In over 950 of 1,000 examples reviewed by Relator, the customer code was "AHMA." Upon information and belief, AHMA stands for "American Home Mortgage Acquisition," a company formed by Wilbur Ross in 2007, to acquire the $45 billion servicing unit of American Home Mortgage Investment Corporation when that company filed for bankruptcy. AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMS"), was formed in 2008 when Ross acquired the mortgage servicing business from American Home Mortgage Investment Corporation.

120. A review of the mortgage assignments prepared by DOCX and all notarized during a single day, July 30, 2009, from 13 Florida counties ((1) Broward, (2) Escambia, (3) Hillsborough, (4) Lake, (5) Lee, (6) Marion, (7) Martin, (8) Miami-Dade, (9) Nassau, (10) Osceola, (11) Palm Beach, (12) Sarasota, and (13) St. Lucie) showed that DOCX prepared a high-volume of mortgage assignments for trusts that used AHMS as the mortgage servicer and LPS as the default management company.

121. These assignments were prepared and filed only in those cases where foreclosure was likely, due to the default in payments by the borrower/homeowners. When the loans went into default, AHMS hired LPS, who in turn retained and supervised the law firms that filed most of the foreclosure actions on behalf of the trusts and used the forged LPS documentation, or assignments fabricated at their law firms, to pursue these

33

foreclosures.  In Florida, for example, five of the largest foreclosure law firms were each

retained by, and acted at the direction of LPS: (1) Florida Default Law Group; (2) the

Law Offices of Marshall C. Watson, P.A.; (3) the Law Offices of David J. Stern, P.A.; (4)

the Law Offices of Daniel C. Consuegra, P.A.; and (5) Shapiro & Fishman, LLP.

122.   Each of the thousands of assignments from July 30, 2009, had the

signatures of Linda Green and Tywanna Thomas as officers of the bank or corporation

identified on the assignment as the grantor.

123.   On each assignment from July 30, 2009, the signature of Linda Green was

witnessed by Dawn Williams and the signature of Tywanna Thomas was witnessed by

Christina Huang.

124.   With one exception, each of the assignments prepared on July 30, 2009,

was notarized by the same notary, Chris Ivey, in Fulton County, Georgia.

125.   There are three distinct variations of the Linda Green signature on the

assignments prepared on July 30, 2009.  In Version 1 of the Linda Green signature, the

signature is characterized by a lower case "L" and no discernible "A" in Linda.  In

Version 2 of the Linda Green signature, the signature is characterized by traditional

cursive letters.  In Version 3 of the Linda Green signature, the signature is characterized

by a large loopy "D" in Linda as the largest letter in the signature and a lower case "L."

126.   Likewise, there are two distinct versions of the Tywanna Thomas signature

on the assignments prepared on July 30, 2009.  In Version 1 of the Tywanna Thomas

signature, the letters are written in lower-case cursive, with a distinct backhand, and only

the first letter or the first two letters, "T" or "Th," of the last name are written.   In

Version 2, the signature has a distinct slant to the right and the Ts resemble printed

34

capital Ts. Only the first letters of each word are written so that "Tywanna" is written as "Ty" and "Thomas" is written as "T."

127. The different signature versions correspond to different batch numbers located in the upper left hand corner of the assignments. All of the assignments with Green Signature Version 1 were used on assignments with Batch Number 6647; all of the assignments with Green Signature Version 2 were used on assignments with Batch Number 6643; the assignment, with Linda Green Signature Version 3, had a different Batch Number: 6633.

128. An examination of the batch numbers and signing dates shows that defendant DOCX produced nearly 1,000 "batches" of mortgage assignments in 2008 and 2009. Examples of dates corresponding to Batch Numbers include the following:

*Date    /   Batch        /   Name / County /   State*

4-1-2008, Batch 1337 Fray, Broward Co, FL
8-13-2008, Batch 1737 Santiago, St. Lucie Co, FL
12-2-2008, Batch 3434 Shrock, Osceola Co, FL
12-29-2008, Batch 3908 Ortiz, South Essex Co, MA
1-14-2009, Batch 4122 Boylan, South Essex Co, MA
1-21-2009, Batch 4220 Pelosi, South Essex Co, MA
2-6-2009, Batch 4434 Clemons, South Essex Co, MA
2-11-2009, Batch 4483 Sorrentino, South Essex Co, MA
2-17-2009, Batch 4553 Vey, Lee Co, FL
3-16-2009, Batch 4919 Banks, South Essex Co, MA
4-23-2009, Batch 5430 Vioria, South Essex Co, MA
5-15-2009, Batch 5707 Dennis, Queens Co, NY
7-16-2009, Batch 6458 Russoniello, Broward Co, FL
7-24-2009, Batch 6572 Cruz, Clay Co, FL
7-24-2009, Batch 6572 Scheetz, Clay Co, FL
7-24-2009, Batch 6572 Curren, Clay Co, FL
8-12-2009, Batch 6842 Ashton, South Essex Co, MA
8-24-2009, Batch 7131 Quintero, Palm Beach Co, FL
11-13-2009, Batch 9140 Dandreo, South Essex Co, MA
12-1-2009, Batch 9416 Velazquez, Lee Co, FL

35

129.   The same names (Green, Thomas, Harp, Thoresen, Odhe, and a few others) were used on thousands of forged assignments filed in North Carolina, South Carolina, Arizona, California, Florida, Illinois, Massachusetts, Mississippi, New York and other states in 2008 and 2009.  Each of those signatures is likely forged or fraudulent, and the assignments to which they were affixed are also fraudulent and legally invalid.  The MBS trustees, which claim ownership of each of these mortgages, will incur significantly higher costs of foreclosure in proving lawful title to the subject property, or will never be able to prove ownership based on forged signatures on assignments to their respective MBS trusts.  The resulting financial harm to the investors of the MBS, including the U.S. government, is substantial.

130.   In 2008 and 2009, DOCX prepared and filed over one thousand "batches," with approximately 1,000 assignments in each batch, or nearly one million such assignments.  DOCX used numerous DOCX employees to sign these names, and paid notaries to falsely notarize the signatures.  DOCX knew, or reasonably should have known, that the notaries had not witnessed the signatures, that various individuals were all claiming to be the same person, and also that the titles that appeared next to the names used by the signatories were false.  The notarizations of those signatures were each false and fraudulent, and the assignments to which they were affixed are also fraudulent and legally invalid.

131.   Similar procedures were used in the LPS offices in Dakota County, Minnesota, and Jacksonville, Florida, with LPS employees falsely claiming titles as corporate officers, and signing in illegible squiggles, instead of a true signature, in a dishonest attempt at evasion so that many people could  sign the same name.

**(b)    Florida**

132.   Beginning in approximately January 2010, much of the mortgage assignment operation of LPS moved from Alphretta, Georgia, to Jacksonville, Florida.  In Jacksonville, LPS employees continued their practice to falsely sign mortgage documents as officers of numerous corporations.  For example, in the first quarter of 2010, one LPS employee, Kathy Smith, signed as an officer of several corporations, including: (1) as an officer of Argent Mortgage Company, LLC; (2) as Assistant Secretary of "MERS, Mortgage-Backed Notes, Series 2005-2" (though no such entity exists and derives, apparently, from a mix up of the names of the grantor and grantee, Deutsche Bank National Trust Company as indenture trustee for American Home Mortgage Investment Trust 2005-2, Mortgage-backed Notes, Series 2005-2); (3) as Assistant Secretary of MERS, acting solely as nominee for American Brokers Conduit, (4) as Assistant Secretary of MERS, acting solely as nominee for American Home Mortgage Acceptance, Inc.; (5) as Assistant Secretary of MERS, acting solely as nominee for American Home Mortgage, and (6) as an officer of Sand Cannon Corporation f/k/a Option One Mortgage Corporation.

133.   Likewise, Michelle Halyard signed as an officer of the mortgagee "Argent Mortgage Company, LLC. By Citi Residential Lending, Inc." and as an officer of Mortgage Electronic Registration Systems Inc. as nominee for American Home Mortgage" but she is actually an employee of LPS based in its Florida Offices.

134.   The grantees on most of the assignments prepared on July 30, 2009, were MBS trusts that used the Trustee Bank Defendants as trustees.

135.   The assignments were prepared and filed only in those cases in which foreclosure was likely, due to the default in payments by the borrower-homeowners.

37

When the loans went into default, the mortgage servicing companies AHMS, SAXON MORTGAGE SERVICES, INC. ("SAXON"), WELLS FARGO HOME MORTGAGE d/b/a AMERICA'S SERVICING COMPANY ("WELLS/ASC") or CITIMORTGAGE and the Mortgage Servicing Defendants hired LPS, who in turn retained the law firms. At the direction of their clients, the law firms submitted to the courts the false and forged documents prepared by LPS and its subsidiary, DOCX.

136. In Florida, for example, five of the largest foreclosure law firms--(1) Florida Default Law Group; (2) Law Offices of Marshall C. Watson, P.A.; (3) Law Offices of David J. Stern, P.A.; (4) Shapiro & Fishman, LLP; and (5) Gladstone Law Group--were each retained by and acted under the direction of LPS. These law firms regularly submitted to the courts forged mortgage assignments prepared by employees at the LPS offices in Dakota County, Minnesota, Alpharetta, Georgia, or Jacksonville, Florida.

137. These law firms were paid significant monthly cash incentives for successfully foreclosing on the most properties in the state. In thousands of foreclosure cases, employees of these law firms falsely signed mortgage assignments pretending to hold the titles of officers of mortgage companies or banks; and other law firm employees notarized these law firm staff assignments falsely attesting that the employees were corporate officers of banks, mortgage servicing companies, or MERS.

138. Cheryl Samons, the office manager for the Law Offices of David J. Stern, P.A., often signed mortgage assignments as a corporate officer of MERS or other corporations, lacking any authority and without disclosing her affiliation with this law firm.

38

139.   Erin Cullaro, formerly an attorney employed by Florida Default Law Group, and subsequently an assistant district attorney assigned to the Economic Crimes Unit of the Florida Attorney General's Office in Tampa, Florida, notarized documents in foreclosure cases, often executed apparently by her sister, Lisa Cullaro, another employee of the Florida Default Law Group.  These notarizations by Erin Cullaro continued after she changed employers and was hired by the Florida Attorney General's Office.  Erin Cullaro's signature is an indecipherable squiggle or mark, or, often, just the letter "E."

140.   Caryn A. Graham, who often signs as a corporate officer of MERS on mortgage assignments prepared by the Law Offices of Marshall Watson, is actually an associate in that law firm.  In these cases, LPS paid these law firms to prepare the mortgage assignments that were signed by the law firm employees posing as corporate officers of the grantors.

### (c)    Minnesota

141.   The assignments used by the law firms hired by LPS prepared in the Dakota County, Minnesota, and Jacksonville, Florida, offices followed the same pattern as the DOCX assignments prepared in Alpharetta, Georgia.  LPS employees signed as if they were officers of banks and mortgage companies when they were not.  The "signatures" were often just a loop, exaggerated check or squiggle, not recognizable as letters of the alphabet and more easily forged by other employees.  The notaries often forgot to complete the notary's attestation and often also signed with loops, checks or squiggles, unrecognizable as alphabet letters.

142.   A LPS employee in Dakota County, Minnesota, Greg Allen, signed mortgage assignments using at least 10 different job titles, as follows:

- Vice President of Mortgage Electronic Registration systems, Inc, solely as nominee for American Brokers Conduit;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic  Registration Systems, as nominee for Bayrock Mortgage Corporation;

- Vice President, Mortgage Electronic Registration Systems, Inc. as Nominee for First Guaranty Mortgage Corporation;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Taylor, Bean & Whitaker Mortgage Corp.;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Market Street Mortgage Corporation;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Maitland Mortgage Lending Company;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for PMC Lending; and

- Vice President, Mortgage Electronic Registration Systems, Inc. as nominee for Southstar Funding, LLC.

143.   A LPS employee in Dakota County, Minnesota, Liquenda Allotey, signed

mortgage assignments using at least five different job titles, as follows:

- Attorney In Fact for Novastar Mortgage;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for American Home Mortgage Acceptance, Inc.;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for Decision One Mortgage Company, LLC;

- Vice President of Mortgage Electronic Registration systems, Inc, as nominee for Freemont Investment & Loan; and

- Attorney in Fact, JP Morgan Chase Bank, National Association, as Successor-in-Interest to Washington Mutual Bank, as Successor-in-Interest to Long Beach Mortgage Company.

144.   A LPS employee in Dakota County, Minnesota, Alfonzo Greene, signed

mortgage assignments using at least three different job titles, as follows:

- Vice President of Mortgage Electronic Registration systems, Inc, solely as nominee for American Brokers Conduit;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for First NLC Financial Services, LLC; and

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Homeowners Friend Mortgage Company, Inc..

145.   A LPS employee in Dakota County, Minnesota, Rick Wilken, signed

mortgage assignments using at least five different job titles, as follows:

- Attorney in Fact of JP Morgan Chase Bank, National Association as successor in interest to Washington Mutual Bank as successor in interest to Long Beach Mortgage Company;

- Attorney in Fact of JP Morgan Chase Bank, National Association as successor in interest to Washington Mutual Bank as successor in interest to Long Beach Mortgage Company

- Officer of Washington Mutual Bank as successor in interest to Long Beach Mortgage Company
- Attorney in Fact of Washington Mutual Bank; and

- Vice President of Mortgage Electronic Registration Systems Inc. as nominee for Premier Mortgage Funding, Inc.

146.   A LPS employee in Dakota County, Minnesota, Cecilia Knox, signed

mortgage assignments using at least two different job titles, as follows:

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for J&S Holdings of Greenville Inc.

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for NovaStar Mortgage Inc.

41

147.  A LPS employee in Dakota County, Minnesota, Bethany Hood, signed mortgage assignments using at least four different job titles, as follows:

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for NovaStar Mortgage Inc.;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Pinnacle Mortgage Inc.;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Lime Financial Services, LTD.; and

- Assistant Vice President of Deutsche Bank National Trust Company, as Trustee for Saxon Asset Securities Trust 2007-1, by Saxon Mortgage Services, Inc..

148.  A LPS employee in Dakota County, Minnesota, Topako Love, signed mortgage assignments using at least four different job titles, as follows:

- Assistant Secretary of Option One Mortgage Corp., Attorney in Fact for H&R Block Mortgage;

- Officer of Mortgage Electronic Registration Systems Inc. as nominee for Gateway Funding Diversified Mortgage Services LP;

- Vice-President of Saxon Mortgage Services, Inc., Attorney In Fact for Novastar Mortgage; and

- Vice President, MERS, as nominee for Mortgage Lenders Network USA, Inc..

149.  In one instance, a forged "Assignment of Mortgage" signed by Topako Love, the date of assignment, February 9, 2009, is after the foreclosure is completed.  The assignment to DBNTC is signed by Topako Love on behalf of SAXON, as attorney in fact for Novastar Mortgage.  The assignment was prepared by Karen A. Thompson, Esq., of the Law Office of Marshall C. Watson.  A typewritten note on the right hand side of the document states: "This Assignment of Mortgage was inadvertently not recorded prior to the Final Judgment of Foreclosure in Case #56-2008-CA-002423, but is now being

42

recorded to clear title." The docket for the St. Lucie County Clerk of the Court shows the

case number corresponds to *DEUTSCHE BANK v. CHRISTY WATTS*, filed March 19,

2008. On January 23, 2009, a final judgment of foreclosure was entered by default in this

case. On January 28, 2009, the plaintiff made a motion for substitution of party plaintiff,

to "Deutsche Bank National Trust Co. as trustee from Novastar," which the court

approved on the same day, the docket shows. On February 9, 2009, eleven days later, the

purported assignment of mortgage from Novastar to DBNTC was signed, and recorded

on February 24, 2009. According to the calendar in the docket, during this foreclosure,

DBNTC did not hold title to the mortgage, contrary to its representations to the court.

The Assignment of Mortgage, filed well after the judgment of foreclosure was entered,

was forged.

150.    A LPS employee in Dakota County, Minnesota, Christina Allen, signed

mortgage assignments using at least three different job titles, as follows:

- Attorney In fact, JP Morgan Chase Bank Attorney In fact for Deutsche Bank National Trust Company, as Trustee Beach Mortgage Loan Trust (sic);

- Vice President, MERS, as nominee for First National Bank of Arizona; and

- Vice President, MERS, as nominee for Mortgage Lenders Network USA, Inc..

151.    A LPS employee in Dakota County, Minnesota, Eric Tate, signed mortgage

assignments using at least six different job titles, as follows:

- Attorney In fact, JP Morgan Chase Bank Attorney In fact for Deutsche Bank National Trust Company, as Trustee Beach Mortgage Loan Trust (sic);

- Attorney In fact, JP Morgan Chase Bank as successor in interest to Washington Mutual Bank formerly known as Washington Mutual Bank;

- Vice President of Mortgage Electronic Registration systems, Inc, solely as nominee for American Brokers Conduit;

43

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for First NLC Financial Services, LLC;

- Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Homeowners Friend Mortgage Company, Inc.; and

- Assistant Vice President of The Coastal Bank.

152.   As mentioned above, for the LPS employees in Dakota County, Minnesota (Greg Allen, Liquenda Allotey, Alfonzo Greene, Rick Wilken,  Cecilia Knox,  Bethany Hood, Topako Love, Christina Allen, and Eric Tate), the use of so many corporate titles shows it is unlikely that the LPS employees were actually the officers of any of the named companies; the LPS employees lacked corporate authority to sign the documents on behalf of the companies.

153.   In most cases, the assignments prepared by LPS employees in Dakota County, Minnesota, and Jacksonville, Florida, benefited the same banks and trusts that benefited from the assignments prepared in Alpharetta, Georgia, namely the Trustee Bank Defendants.

154.   The assignments often were made by grantors who had not themselves been validly assigned the mortgage by the original lender, or by subsequent grantees of the original lender, and so had no title to transfer.  The LPS employees most often represented, falsely, that MERS, or a mortgage servicing company, particularly AHMS or SAXON, had authority to assign the mortgage to the trust when an assignment from the original lender had never been validly made.

155.   The assignments described above were prepared with disregard to the veracity of the stated information.  In addition to the forgeries discussed above, concerning the signers' identities and the authority of the signers, further irregularities

were found, namely: (1) the dates on which the properties became part of the trust were incorrectly stated; (2) the signers often signed as officers of mortgage companies that had filed for bankruptcy or no longer existed, and the signatures were affixed without authorization of the trustee for the estates in the bankruptcy courts or by an authorized party of a purchaser of the companies; and (3) the grantor or grantee was often incorrectly stated, with the grantor or grantee identified in at least 10 instances as "Bogus Assignee for Intervening ASMTS," and in several other cases identified as "A Bad Bene." In other cases, the mortgage company officer forgot to sign, but the empty line was nonetheless witnessed and notarized. In yet other cases, the original loan amount was misstated as $.00 or $.01.

156. In countless other mortgage foreclosure cases, LPS employees prepared affidavits which were filed with courts by the foreclosing law firms in support of summary judgment motions. In these affidavits, the employees again misrepresented their job titles and their personal knowledge of the facts set forth in the affidavits.

157. For example, in a "Lost Assignment Affidavit," dated September 16, 2009, and signed by Green as vice president of American Home Mortgage Servicing, Inc., she asserts that a note dated June 8, 2007, by Michael McGargle, to the order of Homebanc Mortgage Corporation, is lost and not obtainable. Obviously, Green, who works for DOCX, has no knowledge whatsoever of the location or transfer of the documents involved from Homebanc Mortgage Corporation to American Home Mortgage Servicing, Inc..

158. In December 2009, the Fulton County, Georgia, District Attorney's office conducted an investigation of complaints received regarding the documents produced by

the Alpharetta, Georgia, office of DOCX. While claiming to cooperate with the investigation, LPS made misleading statements and concealed the extent of the problems with the fraudulent documents it produced to facilitate mortgage foreclosures, while continuing many of the same practices in Jacksonville, Florida.

159. Thousands of additional fraudulent assignments were prepared and filed in December 2009, and January and February 2010. Most of these "Remediation Assignments" bore the abbreviation "DXFX1 or DXFX2" in the client identification square, but no disclosures were made to investors, courts or mortgagees of the existence and scope of the fraudulent documents. In hundreds of other cases, after the "remediation," assignments were prepared, signed and notarized in the LPS offices in Dakota County, Minnesota, and Jacksonville, Florida, no information identifying the involvement of LPS was included and, instead, a notation was included on these assignments that they were prepared by the "Law Offices of David Stern," or other law firms hired by LPS.

### (d)    South Carolina

160. The name "John Kennerty" appears on over one thousand mortgage assignments prepared by America's Servicing Company (*i.e.*, WELLS/ASC) in Fort Mill, South Carolina. On these assignments, Kennerty signs as an officer of the grantor, but he was, in reality, just an employee of WELLS/ASC, the mortgage servicing company of these grantee trusts.

161. On WELLS/ASC-prepared mortgage assignments, at least three different job titles are listed for John Kennerty, who also signs using the name, "Herman John Kennerty." Titles attributed to Kennerty include the following:

- Assistant Secretary, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Mortgage Network, Inc.;
- VP of Loan Documentation, Wells Fargo Bank, NA Attorney-in-Fact-For-Home 123 Corporation; and
- VP of Loan Documentation, Wells Fargo Bank, NA Attorney-in-Fact-For-New Century Mortgage Corporation.

162. The use of so many different corporate titles for John Kennerty shows it is unlikely that he was actually the officer of any of the named companies; John Kennerty lacked corporate authority to sign the documents of behalf of the companies.

163. The assignments signed by Kennerty also contain false dates of assignment.

164. The name "Nicki Cureton" appears on over one thousand mortgage assignments prepared by WELLS/ASC in Fort Mill, South Carolina. On these assignments, Cureton signs as an officer of the grantor, but Cureton instead works for WELLS/ASC, the mortgage servicing company of these grantee trusts. Without any authority, Cureton signs as the officer of the grantor, or as a MERS officer, for at least 10 different mortgage companies.

165. The use of so many different corporate titles for Nicki Cureton shows it is unlikely that she was actually the officer of any of the named companies; Nicki Cureton lacked corporate authority to sign the documents of behalf of the companies.

166. The Assignments signed by Cureton also contain false dates of assignment.

167. The names "China Brown," "Heather Carrico," "Elizabeth Mathis," "Natasha Clark," appear on over one thousand mortgage assignments prepared by WELLS/ASC in Fort Mill, South Carolina. On these assignments, Brown, Carrico, Mathis or Clark signs as an officer of the grantor, but they are actually employees of WELLS/ASC, the agent mortgage servicing companies of these grantee trusts. Without

47

any authority, Brown, Carrico, Mathis or Clark signs as the officer of the grantor, or as a MERS officer, for at least 10 different mortgage companies.

168. The use of so many different corporate titles for Brown, Carrico, Mathis or Clark shows it is unlikely that they were actually the officer of any of the named companies; Brown, Carrico, Mathis and Clark lacked corporate authority to sign the documents of behalf of the companies.

169. The Assignments signed by Brown, Carrico, Mathis or Clark also contain false dates of assignment.

170. The assignments created by defendant WELLS/ASC were prepared and filed only in those cases in which foreclosure was likely, due to the default in payments by the borrower-homeowners. When the loans went into default, AHMS, SAXON, WELLS/ASC or CITIMORTGAGE hired LPS, who in turn retained law firms. At the direction of their clients, the law firms submitted to the courts the false and forged documents prepared by LPS and its subsidiary, DOCX.

171. In South Carolina, for example, the Korn Law Firm was retained by and acted under the direction of LPS. Employees of the Korn Law Firm signed as officers of MERS, without disclosing that they were associates or support staff in the foreclosing law firms.

172. The Korn Law firm submitted to the courts forged mortgage assignments prepared by employees at the LPS offices in Dakota County, Minnesota, Alpharetta, Georgia, or Jacksonville, Florida.

**B.    Mortgage Assignments Signed By Officers Of The Grantee Fraudulently Identifying Themselves As Officers Of The Grantor**

173.    Relator's investigations revealed that hundreds of mortgage assignments were signed by officers of defendant BA, who fraudulently signed on behalf of the grantor, when they were actually employees of the grantee. By signing as officers of the grantor BA officers, lacking any authority, fraudulently created mortgage assignments to be filed in foreclosure actions.

174.    Among the fraudulent assignments used by defendant BA are also fraudulent documents prepared and signed by employees of the mortgage servicing company LPS. LPS employees Greg Allen, Liquenda Allotey, Christine Anderson, John Codi, John Sobotta, Eric Tate and Rick Wilken signed thousands of documents each week with no review nor any knowledge of their contents, creating forged assignments using fraudulent titles in order to proceed with foreclosures.

175.    Liquenda Allotey, for example, used several titles in documents signed and used in foreclosures by defendant BA in a three-months period:

- Vice President, MERS as Nominee for Bear Sterns Residential Mortgage Corporation;

- Vice President, MERS as Nominee for Ppeples (sic) Choice Home Loan Inc.;

- Vice President MERS as Nominee for First Bank d/b/a First Bank Mortgage;

- Vice President, MERS, as Nominee for EMC Mortgage Corporation;

- Vice President, MERS as Nominee for Mortgage Works Unlimited Inc., d/b/a The Mortgage Works;

- Vice President, MERS as Nominee for Encore Credit Corp. d/b/a ECC Credit Corporation;

- Vice President, MERS.

49

176.   Liquenda Allotey also signed documents used in foreclosures by the

Trustee Bank Defendants using these additional titles:

- Attorney-in-fact, JPMorgan Chase Bank N.A. as successor in interest to Washington Mutual Bank;

- Vice President, MERS as Nominee for Allied Home Mortgage Capital Corp.;

- Vice President, MERS as Nominee for American Home Mortgage Acceptance;

- Vice President, MERS as Nominee for Ampro Mortgage, a division of United Financial Mortgage Corp.;

- Vice President, MERS as Nominee for Colorado Federal Savings Bank;

- Vice President, MERS as Nominee for CTX Mortgage Company, LLC;

- Vice President, MERS, as Nominee for Decision One Mortgage Company, LLC;

- Vice President, MERS as Nominee for Entrust Mortgage Inc.;

- Vice President, MERS, as Nominee for EquiFirst Corp;

- Vice President, MERS as Nominee for Fairfield Financial Mortgage Corp. Inc.;

- Vice President, MERS as Nominee for First Guaranty Mortgage Corp;

- Vice President, MERS as Nominee for First Horizon Home Loan Corp.;

- Vice President, MERS, First NLC Financial Services LLC;

- Vice President MERS as Nominee for First Residential Mortgage Services Corp.;

- Vice President MERS as Nominee for Fremont Investment & Loan;

- Vice President MERS as Nominee for GreenPoint Mortgage Funding Inc.;

- Vice President MERS as Nominee for Homequest Capital Funding;

- Vice President MERS as Nominee for Ivanhoe Financial Inc.;

50

- Vice President MERS, MERS as Nominee for Lending First Mortgage;

- Vice President MERS as Nominee for Market Street Corp.;

- Vice President, MERS, as Nominee for Meritage Mortgage Corp.;

- Vice President, MERS as Nominee for Metrocities Mortgage LLC;

- Vice President, MERS as Nominee for Mortgage Network, Inc.;

- Vice President MERS as Nominee for Pinnacle Mortgage Inc.;

- Vice President MERS as Nominee for SouthStar Funding LLC.

177. Additional assignments were signed by Krystal Hall, Melissa Hively and Vicki Sorg, employees of the mortgage servicing company defendant SCI. Without any authority, these individuals signed on behalf of the grantor when they were actually agents of the grantee, defendant BA.

178. Similarly, Denise Bailey, Diane Dixon and Marti Noriega, employees of Defendant LLS, without any authority, signed as bank officers of the grantor when they were actually agents of the grantee, defendant BA. These individuals also signed without any knowledge of the contents of the documents and using fraudulent titles.

179. In some instances, employees of the law firms hired by defendant BA signed as MERS officers, lacking any authority and without disclosing their affiliation with those law firms.

180. Rhonda Weston, a Vice President of defendant BA signed assignments as an officer of other entities to assign mortgages to BA. The titles used by Rhonda Weston were: (i) Assistant Secretary, MERS for American Brokers Conduit, (ii) Authorized Officer, MERS, as Nominee for CTX Mortgage Company, and (iii) Authorized Officer,

Wells Fargo as Trustee, Banc of America Alternative Loan Trust 2006-8. All of these assignments are fraudulent.

181.    In other instances, Defendant BAC signed without any authority on behalf of WACHOVIA BANK, in order to transfer mortgages to be used by defendant BA in foreclosures.  Mark Bishop signed as Vice President of Wachovia when he was actually affiliated with Defendant BAC.

182.    In several cases, including all of the assignments prepared by defendants SCI and LLS and used by defendant BA in foreclosure actions filed throughout the United Stated, and almost the entirety of the assignments prepared by LPS, the grantee was a RMBS Trust. The dates of the assignments were two years, or more, after the closing date of the trust in violation of the terms of the agreements as indicated in the Prospectuses and other documents disseminated to the investors. The late assignments caused the MBS Trust to lose their tax-exempt status and triggered payment of taxes by the Trusts, which remain unpaid at this time.

183.    In other cases, Relator found that the Trustee Bank Defendants used fraudulent mortgage assignments prepared by the Mortgage Servicing Defendants in Fort Mill, South Carolina to supply missing assignments. John Kennerty and other officers signed on behalf of the grantor without any authority.

184.    Furthermore, Relator found that numerous assignments used by the Trustee Bank Defendants were fabricated within 30 days of the commencement of the foreclosure actions.  Because the mortgage assignments were missing, the Defendants created forged assignments to proceed with foreclosures when needed. Defendant BA created several forged assignments within a few days of the commencement of the foreclosure. For

example, an assignment from WELLS FARGO to defendant BA, as Trustee for Lehman XS Trust Series 2007-9 was filed on the same date of the filing of the foreclosure action for which it was fabricated. Likewise, an assignment from WASHINGTON MUTUAL BANK N.A. to BA as Trustee for WaMu Series 2007-0A4 Trust, was filed on March 30, 2009 while the foreclosure action was filed on February 27, 2009, over a month before defendant BA acquired the mortgage. An assignment from JPMorgan Chase to BA, as Trustee for WaMu Series 2006-AR9 Trust, was signed on March 3, 2009, while the foreclosure action was filed prior to that date on February 27, 2009. Another assignment from WELLS FARGO to Defendant BA was signed and notarized on December 29, 2008 but the transfer is said to have taken place over three years prior to that date "on or before November 23, 2005." Relator detected numerous cases of similar fraudulent assignments filed in foreclosure actions pursued by the Defendants.

185.   Despite the lack of valid assignments, the Depositor Defendants offered securities to the investors knowing that the Trusts did not have good title to the collateral assets. For example, Defendant ACE was the depositor for at least ten trusts that did not hold the mortgage assignments. Likewise, Defendant BAMS was the depositor for at least nine trusts that did not have valid mortgage assignments.

### C.   Defendants' Use of Fake Documents, False Officer Titles, and Forged Signatures Violates the Federal Lending Laws, and State Mortgage Fraud and Notary Fraud Laws

186.   As with Relator's Foreclosure, the assignments are forged and void in each and every one of the foreclosures relying on documents derived from the Defendants.

187.   Affixing or submitting false signatures on a mortgage document is a violation of federal and state law, and those signatures are without authority to complete the transaction. *See, e.g.,* federal laws cited in paragraph 60, above; *and see,* Georgia

Residential Mortgage Fraud Act, Ga. Code § 16-8-100 *et seq.* (crime considered a felony); Minn. Stat. § 609.64, recording, filing of forged instrument ("Whoever intentionally presents for filing, registering, or recording, or files, registers, or records a false or forged instrument relating to or affecting real or personal property in a public office entitled to file, register, or record such instrument when genuine may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $5,000, or both."). North Carolina law also prohibits and punishes mortgage fraud. N.C, Gen. Stat. § 14-119 Forgery of notes, checks, and other securities; counterfeiting of instruments ("It is unlawful for any person to forge or counterfeit any instrument, or possess any counterfeit instrument, with the intent to injure or defraud any person, financial institution, or governmental unit. Any person in violation of this subsection is guilty of a Class I felony."); N.C. Gen. Stat. § 14-120 Uttering forged paper or instrument containing a forged endorsement ("If any person, directly or indirectly, whether for the sake of gain or with intent to defraud or injure any other person, shall utter or publish any such false, forged or counterfeited instrument as is mentioned in Gen. Stat. § 14-119, or shall pass or deliver, or attempt to pass or deliver, any of them to another person (knowing the same to be falsely forged or counterfeited) the person so offending shall be punished as a Class I felon. If any person, directly or indirectly, whether for the sake of gain or with intent to defraud or injure any other person, shall falsely make, forge or counterfeit any endorsement on any instrument described in the preceding section, whether such instrument be genuine or false, or shall knowingly utter or publish any such instrument containing a false, forged or counterfeited endorsement or, knowing the same to be falsely endorsed, shall pass or deliver or attempt to pass or deliver any such

54

instrument containing a forged endorsement to another person, the person so offending shall be guilty of a Class I felony."); N.C. Gen. Stat. § 53-244.111(8) makes unlawful "To engage in any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud upon any person in connection with the brokering or making or servicing of, or purchase or sale of, any mortgage loan."

188.   False or fraudulent notary acknowledgements are also a violation of state law, and the underlying signature is void. *See, e.g.,* N.C. Gen. Stat. § 10B-22 ("A notary shall not execute a notarial certificate containing information known or believed by the notary to be false"); Georgia notary fraud, O.C.G. § 45-17-1 *et seq.* (penalty is a misdemeanor); Minn. Stat. § 359.085, standards of conduct for notarial acts ("In witnessing or attesting a signature, the notarial officer must determine, either from personal knowledge or from satisfactory evidence, that the signature is that of the person appearing before the officer and named in the document or electronic record. When witnessing or attesting a signature, the officer must be present when the signature is made."); *and* S.C. Code § 26-1-95 ("A notary public who, in his official capacity, falsely certifies to affirming, swearing, or acknowledging of a person or his signature to an instrument, affidavit, or writing is guilty of a misdemeanor and, upon conviction, must be fined not more than two hundred dollars or imprisoned not more than thirty days.").

189.   The mortgage assignments prepared by LPS employees or agents, or the employees of law firms retained by LPS and by the Mortgage Servicing Defendants, are likely fraudulent, in violation of law, and do not assign the notes and mortgages to the Trustee Bank Defendants.  Therefore, the Trustee Bank Defendants lack any authority to act as plaintiffs in foreclosure actions filed on defaulted notes and mortgages for their

MBS. The Trustee Bank Defendants are not a true party in interest in such foreclosures, and cannot prosecute the foreclosures.

### D.    Defendants' False Statements To The Investors

190.   All of the MBS Trusts that used false or fraudulent mortgage assignments, and were never assigned the notes and the mortgages, issued false statements to the investors, including the U.S. Government, the State of North Carolina and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York.

191.   False statements and material omissions concerning the notes and mortgage assignments were included in each prospectus for the trusts. Illustrative are the false statements and material omissions included in the filings of Soundview Home Loan Trust 2007-OPT2 ("Soundview Trust"), one of the MBS Trust including false assignments. On January 29, 2007 Greenwich Capital Acceptance Inc. and Financial Asset Securities Corporation (respectively, the Sponsor and Depositor of Soundview Trust) filed a Form S-3 (no. 333-140279), amended on March 16, 2007 and March 23, 2007, for the offering of Mortgage backed/Asset-backed Securities later issued by the Soundview Trust. The registration statements represent that the loans will be acquired by the depositor from the seller and conveyed by that depositor to the trustee named in the related prospectus supplement for the benefit of the holders of the securities of the related series. As detailed above, these statements are false and misleading in that the loans were never acquired.

192.   On June 18, 2007 Soundview Trust issued its prospectus supplement, which also includes multiple false statements. Pursuant to the prospectus, the trust issued twenty

classes of certificates. The assets of the trust supporting the certificates were identified as

a pool of fixed rate and adjustable-rate, first lien mortgage loans having the

characteristics described in the prospectus. The prospectus falsely stated that on the

closing date (indicated as on or about July 10, 2007) "the trust will acquire a pool of

approximately 2,200 first lien, fixed-rate and adjustable-rate mortgage loans having an

aggregate principal balance as of the Cut-Off date[9] of approximately $562,080,117 (the

"Mortgage Loans")." The prospectus also states that pursuant to the Pooling and

Servicing Agreement as of the Cut-Off date, the Depositor (i.e. Financial Asset Securities

Corporation, a Delaware corporation and an affiliate of Greenwich Capital Markets, Inc.)

will cause the Mortgage Loans to be assigned to the Trustee (i.e. Wells Fargo Bank,

N.A.) for the benefit of the certificateholders. Further, the section "Assignment of the

Mortgage Loans" in the prospectus states:

> On the closing Date, the Depositor will transfer to the Trust
> all of its right, title and interest in and to each Mortgage
> Loan, **the related mortgage note**, Mortgage, **assignment
> of mortgage in recordable form in blank or to the
> Trustee and other related documents** ("collectively, the
> "*Related documents*"), including all scheduled payments
> with respect to each such Mortgage Loan due after the Cut-
> Off Date. The Trustee, concurrently with such transfer, will
> deliver the Certificates to the Depositor. Each Mortgage
> Loan transferred to the Trust will be identified on a
> schedule (the "*Mortgage Loan Schedule*") delivered to the
> Trustee pursuant to the Pooling Agreement. [...] The
> Pooling Agreement will require that, within the time period
> specified therein, the Depositor will deliver or cause to be
> delivered to the Trustee (or the Custodian on behalf of the
> Trustee) the mortgage notes endorsed to the Trustee on
> behalf Certificateholders and the Related Documents. In
> lieu of delivery of original Mortgages or mortgage notes, if
> such original is not available or is lost, the Depositor may
> deliver or cause to be delivered true and correct copies

---

[9] The Cut-Off date is defined as July 1, 2007.

thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the Originator. […] On or prior to the Closing Date, the Trustee (or the Custodian on behalf of the Trustee) will review the Mortgage Loans, together with the Related Documents pursuant to the Pooling Agreement and if any Mortgage Loans or Related Documents is found not to conform to the Trustee's (or the Custodian's) review criteria set forth in the Pooling Agreement and if any material defect is not cured within 90 days following notification thereof to the Originator by the Trustee, the Trustee will enforce the Originator's obligations under the Master Agreement to either: (i) substitute for such Mortgage Loan a Qualified Substitute Mortgage Loan; however, such substitution is permitted only within two years of the Closing Date and may not be made unless an opinion of counsel is provided to the effect that such substitution will not disqualify any of the REMICs (as defined in the Pooling Agreement) as a REMIC or result in a prohibited transaction tax under the Code; or (ii) purchase such Mortgage Loan at a price (the *"Purchase Price"*) equal to the outstanding Principal Balance of such Mortgage Loan as of the date of purchase, plus all accrued and unpaid interest thereon, computed at the Mortgage Rate through the end of the calendar month in which the purchase is effected, plus the amount of any unreimbursed Advances and Servicing Advances (each as defined herein) made by the Servicer, plus any costs and damages incurred by the Trust in connection with any violation by such loan of any predatory-or abusive-lending law. […]

(Emphasis added)

193. The prospectus further states that "Wells Fargo Bank is acting as custodian of the mortgage loan files pursuant to the Pooling Agreement. In that capacity, Wells Fargo is responsible to hold and safeguard the mortgage notes and other contents of the mortgage files on behalf of the Trustee and the Certificateholders. Wells Fargo Bank maintains each mortgage loan file in a separate file folder marked with a unique bar code to assure loan-level file integrity and to assist in inventory management. Files are segregated by transaction or investor." These statements are false in that the mortgage

58

notes were never delivered and are not included among the files maintained by Wells Fargo.

194.   The Pooling and Servicing Agreement, filed with the SEC, contains additional false statements and material omissions.  Section 2.01 of the Pooling and Servicing Agreement, entitled "Conveyance of Mortgage Loans," states that, among other things, the following documents were delivered to the trust: (i) the original mortgage note, (ii) the original mortgage, (iii) an original assignment, and (iv) an original of any intervening assignment of mortgage showing a complete chain of assignment. These documents were never transferred and these statements are false and fraudulent.

195.   Furthermore, the prospectus required the Trustee to certify "that as to each Mortgage Loan listed in the Mortgage Loan Schedule […] it (or its custodian) has received the applicable documents listed in Section 2.01 of the Pooling and Servicing Agreement."  Because the documents were never delivered, this certification by the Trustee was false.

196.   These statements disseminated to the investors, which are substantially the same in all of the prospectuses, pooling and servicing agreements and trustee certifications for the trusts here at issue, are false because the MBS Trusts never acquired most of the mortgage loans. The Trustees never reviewed the assignments, the notes, or any relevant documents or, if they did, they knowingly disregarded the missing assignments. Furthermore, rather than following the prospectus' specific procedures to correct the issue, the Defendants created fraudulent assignments to conceal it. Indeed, the act of fabricating the assignments is evidence that the MBS Trust did not own the notes and/or the mortgage liens for some assets claimed to be in the pool.

197.  Other examples of numerous false statements and material omissions were included in the Prospectus of Merrill Lynch First Franklin Mortgage Loan Trust/Series 2007-1, one of the MBS Trusts including false assignments prepared by the Defendants. Defendant BA is a Trustee of this MBS Trust. Among the assets of the MBS Trust are properties located in North Carolina, as specified above. The Prospectus,[10] filed on March 27, 2007 states at p. 32 "all of the Mortgage Loans[11] will be transferred and assigned to the Depositor on the Closing Date.[12] All the Mortgage Loans were acquired in 2007." At p. 80 the section of the prospectus titled "Assignment of Mortgage Loans" further indicates that "The Mortgage Loans will be assigned to the Trustee, together with all principal and interest received with respect to the Mortgage Loans on and after the Cut-off Date."[13] The Prospectus further identifies the documents that are generally required to be delivered to the Trustee, in accordance with the Pooling and Servicing Agreement,  including: (1) the related original Mortgage Note, with any riders thereto, endorsed without recourse to the Trustee or in blank, (2) the original Mortgage, with any riders thereto, with evidence of recording indicated (or, if the original recorded Mortgage has not yet been returned by the recording office, a copy thereof certified to be a true and complete copy of such mortgage sent for recording) […], (3) an original assignment of the Mortgage to the Trustee or in blank in recordable form […].  Furthermore at p. 230 of the Prospectus, the section entitled "Assignment of Assets; Repurchase" confirms that "with respect to each Mortgage Loan, the Depositor will deliver or cause to be delivered

---

[10] The filing may be found at http://www.secinfo.com/dsvr4.u4E1.htm.
[11] According to the Prospectus, the mortgage loans consisted of approximately 10,755 conventional mortgage loans evidenced by promissory notes having an aggregate principal balance of approximately $2,234,527,127.
[12] The Closing date is defined as March 27, 2007.
[13] The cut-off date is defined as March 1, 2007.

to the Trustee (or to the custodian [...]) certain loan documents, which will include the original Mortgage Note endorsed, without recourse, in blank or to the order of the Trustee, the original Mortgage (or a certified copy thereof) with evidence of recording indicated thereon and an assignment of the Mortgage to the Trustee in recordable form."

198. According to the prospectus, the Trustee or the Custodian had a duty to review such mortgage loan documents within a specified period of days after receipt and had a duty to hold them in trust for the benefit of the certificateholders. A procedure to be followed in the event that certain documents are missing or defective in any material respect is specified in the Prospectus.

199. The Trustee never received these documents, and never reported their material defects when fraudulent documents were fabricated. The Trustee, however, issued certificates of compliance falsely attesting that it had fulfilled all its obligations under the agreement in all material respects. These certificates were attached to the Prospectuses and filed by the Trustees.

200. SEC regulations required the Depositor Defendants and the Mortgage Servicing Defendants of the MBS Trusts to file certificates attesting that they have fulfilled their duties. In particular, 17 C.F.R. § 229.1122(d)(4) require mortgage services to file a report indicating whether "[c]ollateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents" and whether "[p]ool assets and related documents are safeguarded as required by the transaction agreements." Similarly, 17 C.F.R. § 229.1123 requires filing a statement that "the servicer has fulfilled all of its obligations under the agreement in all material respects throughout the reporting period or, if there has been a failure to fulfill any such obligation

in any material respect, specifying each such failure known to such officer and the nature and status thereof."

201. The certificates filed by the Mortgage Servicing Defendants pursuant to these provisions were false, because they failed to state that the notes and mortgage assignments had not been transferred to the trusts. In some instances, the Defendants noted non-compliance, but only with reference to minor issues and never disclosed that the mortgage and the notes and the related documents were missing. For example, in the certification filed by SAXON accompanying the form 10-K for the MBS Trust Merrill Lynch First Franklin Mortgage Loan Trust/Series 2007-1 filed on March 15, 2007, David Dill signed SAXON's certification disclosing that "in regard to Items 1122(d)(4) and 1122(d)(1)(ii),[14] based on a review of a sample of 45 loans, it was determined that 36 lien releases where not sent to consumers or to the recording jurisdiction, as appropriate." SAXON failed to inform the investors that, in violation of the SEC regulation 17 C.F.R. § 229.1122 the collateral was not maintained as required by the applicable agreements and that the relevant documentation was missing.

202. The Depositor Defendants also issued false certificates of compliance attached to forms 10-K, filed with the SEC and disseminated to the investors. In these certificates the Depositor Defendants falsely alleged that the periodic reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements not misleading. The certificates also contained a declaration of compliance with 17 C.F.R. § 229.1123. The provision requires an assessment of whether the mortgage and related documents, rather than the physical properties underlying the mortgages, are maintained as required by the transaction agreements or related pool asset

documents. The Depositor Defendants did not comply with the requirement imposed by the regulation because the mortgage and related documents were not maintained as required.

203.   The MBS Trusts also filed monthly reports including details on the foreclosures, among other information. The reports omit to state that notes and mortgage assignments were missing and fail to disclose the fraudulent activities conducted by the Defendants to pursue foreclosures.

204.   Defendants knowingly issued these false statements and omissions to the investors. The Defendants knew, or should have known, that among the investors were the U.S. government and the States of North Carolina, California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York. The U.S. Government, the States, the City of Chicago and the City of New York, had routinely purchased MBS securities and their future purchases of securities of the MBS Trusts including false or fraudulent representations and omission was foreseeable.

## VII.    THE U.S. GOVERNMENT PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM

205.   The U.S. government has purchased MBS with missing or forged assignments through several avenues.  These include: (1) Federal Reserve funding to purchase MBS through two limited liability companies, titled "Maiden Lane;" (2)

---

[14] This item requires policies and procedures to be instituted if material servicing activities are outsourced.

Treasury and other agency funding to purchase MBS through public-private partnership investment funds; and (3) Federal Reserve direct purchases of MBS.

### A.    Types of MBS

206.    There are two types of mortgage-backed securities: (1) residential MBS ("RMBS") is composed of home mortgages, such as Relator's Mortgage and ones described herein; and (2) commercial MBS ("CMBS") is composed of mortgages for retail space, office buildings and warehouses, which is not at issue in this suit. The present case is concerned with RMBS.

207.    RMBS is categorized as "agency" or "non-agency," which refers to involvement of the government-sponsored entities, *e.g.*, Freddie Mac, Fannie Mae and Ginnie Mae. Non-agency RMBS are residential mortgage-backed securities that are not issued or guaranteed by a U.S. government agency. Like agency RMBS, non-agency RMBS represent interests in "pools" of mortgage loans secured by residential real property.

### B.    MBS Purchases by Federal Reserve Funding of Maiden Lane Transactions

208.    In 2008, to respond to the financial crisis, the Federal Reserve Board authorized the Federal Reserve Bank of New York ("New York Fed") to facilitate the formation of three limited liability companies. Two of these companies hold MBS which are missing assignments or using forged assignments. (The third company formed does not hold MBS).

209.    The first of these companies, Maiden Lane LLC ("ML LLC"), was formed to facilitate the merger of the Bear Stearns Companies, Inc., and JPMorgan Chase & Co.,

Inc.. The New York Fed extended credit to ML LLC to acquire certain assets of Bear Stearns.

210.   The U.S. government provided the funds to ML LLC to purchase the MBS; according to statement of the New York Fed: "ML LLC was formed in the second quarter of 2008. ML LLC borrowed approximately $28.8 billion from the New York Fed in the form of a senior loan (Senior Loan), which, together with funding from JPMC of approximately $1.15 billion in the form of a subordinate loan (Subordinate Loan, and together with the Senior Loan, the Loans) was used to purchase the Asset Portfolio from Bear Stearns. The Asset Portfolio had an estimated fair value as of March 14, 2008, of approximately $30 billion. The New York Fed has all material control rights over the Asset Portfolio and is the sole and managing member of ML LLC." New York Fed Web site (http://www.newyorkfed.org/markets/ maidenlane.html).

211.   As of March 31, 2010, ML LLC had purchased and held $2.069 billion in 12 MBS that Relator found had missing or forged assignments. According to the published list of ML LLC holdings, the 12 MBS listed in Table 2, below, correspond to the MBS which Relator found to have missing or forged assignments.

Table 2.  Maiden Lane LLC Holdings, as of March 31, 2010, that are included among the forged assignments

| # | Maiden Lane LLC Holding | Government Funding |
|---|---|---|
| 1 | Bear Stearns ALT-A ll, 2007-1 [a/k/a CITIBANK: Structured Asset Mort. Investments II, Inc., Bear Stearns ALT-A Trust II, Series 2007-1] | $1,148,679,970 (at 67) |
| 2 | Harborview MTG LN TR 2006-9 [a/k/a DEUTSCHE BANK: HarborView Mort. Loan Trust, Series 2006-9] | $17,289,000 (at 75) |

| 3 | Morgan Stanley ABS 2007-HE2<br>[a/k/a DEUTSCHE BANK: Morgan Stanley ABS Capital 1, Inc., MSAC 2007-HE2] | $738,000 (at 77) |
| 4 | SOUNDVIEW HM LN 2007-OPT2<br>[a/k/a WELLS FARGO: Soundview Home Loan Trust 2007-OPT2] | $6,650,000 (at 81) |
| 5 | STRUCTURED ASSET MTG 2007-AR2<br>[a/k/a CITIBANK: Structured Asset Mort. Investments II Trust 2007-AR2] | $58,506,154 (at 83) |
| 6 | STRUCTURED ASSET MTG 2007-AR5<br>[a/k/a CITIBANK: Structured Asset Mort. Investments II Trust 2007-AR5] | $8,735,000 (at 83) |
| 7 | STRUCTURED ASSET MTG 2007-AR6<br>[a/k/a CITIBANK: Structured Asset Mort. Investments II Trust 2007-AR6] | $819,668,268 (at 83) |
| 8 | AMSI 2005-R3 M8, M9<br>[a/k/a DEUTSCHE BANK: Ameriquest Mort. Securities Trust 2005-R3] | $800,000 (at 101) |
| 9 | AMSI 2005-R7 M8<br>[a/k/a DEUTSCHE BANK: Ameriquest Mort. Securities Trust 2005-R7] | $10,000,000 (at 101) |
| 10 | CARR 2006-OPT1 M9<br>[a/k/a WELLS FARGO: Carrington Mort. Loan Trust, Series 2006-OPT1] | $2,000,000 (at 107) |
| 11 | MSAC 2005-HE1 B3<br>[a/k/a DEUTSCHE BANK: Morgan Stanley ABS Capital 1, Inc., Series 2005 HE1] | $2,093,798 (at 119) |
| 12 | SVHE 2006-EQ1 M5<br>[a/k/a DEUTSCHE BANK: Soundview Home Loan Trust, Series 2006-EQ1] | $-5,660,323 (at 126) |

*Source*: Federal Reserve Bank of New York Web site, Maiden Lane Transactions, "Holdings of Maiden Lane LLC as of March 31, 2010" (http://www.newyorkfed.org/ markets/maidenlane.html).

212.  The second and third companies, Maiden Lane II LLC ("ML II LLC") and Maiden Lane III LLC ("ML III LLC"), were formed to facilitate the restructuring of the New York Fed's financial support to American International Group ("AIG").  The New York Fed extended credit to ML II LLC to purchase residential mortgage-backed securities from the securities lending portfolio of several regulated U.S. insurance subsidiaries of AIG.  ML III LLC represented that it purchased only collateralized debt obligations, and did not purchase MBS, as shown on its list of holdings as of March 31, 2010.

213.  According to the New York Fed, the U.S. government provided the funds to ML II LLC to purchase the MBS: "ML II LLC was formed in the fourth quarter of 2008. On December 12, 2008, ML II LLC purchased RMBS with an estimated fair value of approximately $20.8 billion, determined as of October 31, 2008 (Asset Portfolio). ML II LLC financed this purchase by borrowing $19.5 billion (Senior Loan) from the New York Fed. The Senior Loan proceeds, after adjustments (totaling $0.3 billion between October 31, 2008, and December 31, 2008) including principal and interest payments received by the AIG Subsidiaries on the RMBS, were used to purchase the $20.8 billion Asset Portfolio. In addition to receiving the cash purchase price on the closing date, AIG Subsidiaries received a contingent right to collect the deferred portion of the total purchase price of $1.0 billion (Fixed Deferred Purchase Price) plus a one-sixth participation in the residual portfolio cash flow, if any, each following ML II LLC's repayment of the Senior Loan and accrued interest thereon to the New York Fed. As of October 31, 2008, the Asset Portfolio had a par value of approximately $39.3 billion. The New York Fed has all material control rights over the Asset Portfolio and is the sole

and managing member of ML II LLC." New York Fed Web site, Maiden Lane II LLC

transactions (http://www.newyorkfed.org/markets/maidenlane2.html).

214.   As of March 31, 2010, ML II LLC had purchased and held $570 billion in

15 MBS that Relator found had missing or forged assignments.  According to the

published list of ML LLC holdings, the 12 MBS listed in Table 3, below, correspond to

the MBS which Relator found to have missing or forged assignments.

Table 3. Maiden Lane II LLC Holdings, as of March 31, 2010, that are included among
the forged assignments

| # | Maiden Lane II LLC Holding | Government Funding |
|---|---|---|
| 1 | ACE_06-OP1<br>[a/k/a HSBC: Ace Securities Corp. Home Equity Loan Trust, Series 2006-OP1] | $7,000,000 (at 1) |
| 2 | AMIT_05-3<br>[a/k/a DEUTSCHE BANK: American Home Mort. Investment Trust Series 2005-3] | $35,658,000 (at 1) |
| 3 | ARMT_07-1<br>[a/k/a U.S. BANK: MASTR Adjustable Rate Mortgages Trust 2007-1] | $11,156,000 (at 1) |
| 4 | ABFC_06-OPT2<br>[a/k/a WELLS FARGO: ABFC 2006-OPT 2 Trust] | $12,000,000 (at 1) |
| 5 | BSAA_07-3<br>[a/k/a CITIBANK: Structured Asset Mort. Investments II, Inc., Bear Stearns ALT-A Trust, Series 2007-3] | $156,304,497 (at 2) |
| 6 | CARR_06-OPT1<br>[a/k/a WELLS FARGO: Carrington Mort. Loan Trust, Series 2006-OPT1] | $28,786,919 (at 3) |
| 7 | BNCMT_07-3<br>[a/k/a CITIBANK: BNC Mortgage Loan Trust 2007-3] | $30,000,000 (at 2) |

| 8 | MSAC_07-HE6<br>[a/k/a DEUTSCHE BANK: Morgan Stanley ABS Capital 1, Inc., Series 2007-HE6] | $68,000,000 (at 10) |
|---|---|---|
| 9 | MSIX_06-1<br>[a/k/a DEUTSCHE BANK: Morgan Stanley IXIS Real Estate Capital Trust, 2006-1] | $43,255,000 (at 10) |
| 10 | OOMLT_05-4<br>[a/k/a WELLS FARGO: Option One Mort. Loan Trust, Series 2005-4] | $15,151,774 (at 12) |
| 11 | OOMLT_05-5<br>[a/k/a WELLS FARGO: Option One Mort. Loan Trust, Series 2005-5] | $5,866,603 (at 12) |
| 12 | OOMLT_06-3<br>[a/k/a WELLS FARGO: Option One Mort. Loan Trust, Series 2006-3] | $23,500,000 (at 12) |
| 13 | SAST_06-3<br>[a/k/a DEUTSCHE BANK: Saxon Asset Securities Trust 2006-3] | $111,000,000 (at 14) |
| 14 | SAIL_04-8<br>[a/k/a LASALLE BANK: Securitized Asset Investment Loan Trust, 2004-8] | $10,256,786 (at 14) |
| 15 | WAMU_07_HE3<br>[a/k/a CITIBANK: WAMU Series 2007-HE3 Trust] | $12,000,000 (at 15) |

*Source*: Federal Reserve Bank of New York Web site, Maiden Lane Transactions, "Holdings of Maiden Lane II LLC as of March 31, 2010" (http://www.newyorkfed.org/markets/maidenlane.html ).

215.  In total, the ML LLC and ML II LLC entities own $2.639 billion ($2.069 billion ML LLC + $570 million ML II LLC) of MBS including missing assignments or use forged assignments, as shown in Tables 2 and 3 above.

**C.    MBS Purchases by Treasury Financing of Public-Private Partnership Funds.**

216.  In addition to the purchases above, to purchase non-agency RMBS, and other securities, on March 23, 2009, the U.S. Treasury, in conjunction with the Federal

69

Deposit Insurance Corporation and the Federal Reserve Bank, announced the creation of the Public-Private Investment Partnership ("PPIP") of 2009, as a part of the government's Financial Stability Plan. Under the PPIP, the Treasury provides equity and debt financing to newly-formed public-private investment funds ("PPIFs") established by fund managers with investors for the purpose of purchasing legacy securities from financial institutions. These securities are commercial MBS and non-agency residential MBS. According to a Treasury press release: "The PPIP is designed to encourage the transfer of certain illiquid legacy real estate-related assets off of the balance sheets of financial institutions, restarting the market for these assets and supporting the flow of credit and other capital into the broader economy. PPIP funds established under the legacy loan program will be established to purchase troubled loans from insured depository institutions and PPIP funds established under the legacy securities program to purchase from financial institutions legacy non-Agency RMBS and newly issued and legacy CMBS that were originally AAA rated. PPIFs will have access to equity capital from the U.S. Treasury as well as debt financing provided or guaranteed by the U.S. government."

217. In 2009, the Treasury selected private fund managers to operate funds that would purchase non-agency RMBS through a mix of private and government financing, listed in Table 4, below ("PPIF Managers").

Table 4. PPIFs holding non-agency RMBS, as of 3/31/10

| # Fund | Fund Creation Date |
|---|---|
| 1. AG GECC PPIF Master Fund, L.P. | 11/12/09 |
| 2. AllianceBernstein Legacy Securities Master Fund, L.P. | 10/23/09 |
| 3. Blackrock PPIF, L.P. | 10/16/09 |
| 4. Invesco Legacy Securities Master Fund, L.P. | 10/13/09 |

| 5. Marathon Legacy Securities Public-Private Investment Partnership, L.P. | 12/15/09 |
| 6. Oaktree PPIP Fund, L.P. | 02/19/10 |
| 7. RLJ Western Asset Public/Private Master Fund, L.P. | 11/23/09 |
| 8. Wellington Management Legacy Securities PPIF Master Fund, LP | 10/19/09 |

*Source*: U.S. Treasury, Legacy PPIP Second Quarterly Report (quarter ending March 31, 2010) (http://www.financialstability.gov/roadtostability/publicprivatefund.html).

218.   In 2009, the Treasury entered into limited partnership agreements ("PPIP Agreements") with each of the PPIF Managers listed in Table 4 to purchase a portfolio of non-agency RMBS. *See* U.S. Treasury, Legacy Securities Public-Private Investment Program, Fund Manager Documentation, Limited Partnership and Loan Agreements (http://www.financialstability.gov/roadtostability/legacysecurities.html#contracts).

219.   Under the terms of the PPIP Agreements, the Treasury provided debt and equity financing to the PPIF Managers from the Troubled Asset Relief Fund ("TARP"), created by the Emergency Economic Stabilization Act of 2008 ("EESA"), Pub. L. No. 110-343, 122 Stat. 3765 (2008), *codified at* 12 U.S.C. § 5201 *et seq.*. Congress passed the EESA, which provided the Treasury with the authority to purchase or guarantee up to $700 billion in troubled assets held by financial institutions.  Treasury was directed to exercise this authority to promote the liquidity and stability of the financial system.

220.   As of March 31, 2010, the PPIF Managers had acquired $8.8 billion of the non-agency RMBS.  The Legacy PPIP Second Quarterly Report states: "As of March 31, 2010, the eight funds participating in the program had acquired just over $10 billion in eligible assets, compared to $3.4 billion at the end of 2009.  About 88 percent of the PPIP

71

portfolio holdings, or $8.8 billion, are non-agency residential mortgage-backed securities (RMBS). Twelve percent, or $1.2 billion, are commercial mortgage-backed securities (CMBS). Of the RMBS assets, nearly half fall into the Alt-A loan category." The PPIF Managers have $25.1 billion of remaining purchasing power, which figure would mean purchases of an additional $22.1 billion of non-agency RMBS (applying the 88 percent ratio of the current portfolio). Thus, PPIF Managers, using TARP funds provided by the Treasury, will soon own over $30 billion of non-agency RMBS under the PPIP.

221.   Upon information and belief, the purchases by the PPIF Managers include the securities for the MBS trusts in which the Defendants participate, as described herein, including forged assignments.

### D.     MBS Purchases by Federal Reserve and Treasury Direct Purchases

222.   On December 30, 2008, the Federal Reserve and the U.S. Treasury announced that they would purchase agency MBS to support the housing market, and to date it has purchased $1.25 trillion of those securities. *See*, Press release, Federal Reserve Bank, Dec. 30, 2008 (http://www.federalreserve.gov/newsevents/press/monetary/20081230b.htm); *and see*, MBS purchase program FAQs, N.Y. Federal Reserve Bank (http://www.newyorkfed.org/markets/mbs_faq.html ). On January 8, 2010, the *Wall St. Journal* reported that: "The Fed now holds $909 billion of mortgage-backed securities. In the past year it has purchased 73% of the mortgages that government-backed Fannie Mae, Freddie Mac and Ginnie Mae have turned into securities. Purchases by the Treasury pushed total government purchases above $1 trillion." Liz Rappaport and Jon Hilsenrath, "Fed Plan to Stop Buying Mortgages Feeds Recovery Worries," *WSJ*, Jan. 8, 2010 (http://online.wsj.com/article/ SB126291088200220743.html).

E.    **Damages to the U.S. Government**

    (a)    **Impaired Value of MBS**

223.   Each of the Defendants named herein participates, or has participated, in MBS trusts that are missing lawful assignments from originating banks to the trusts, and has used forged instruments instead.  To date, the Defendants had not disclosed to investors, including the Treasury, that the trust assets were severely impaired because of the forged and fraudulent assignments.

224.   In any foreclosures on assets in the trust, the Trustee Bank Defendants will be unable, or will have to expend significant funds, to prove their allegations that the trust is the lawful owner of the subject mortgage, in addition to expenses due to the filing of forged assignments.  The amount the Trustee Bank Defendants will expend to prove their ownership is materially more than they would have spent if they had complied with the procedures described in the respective prospectus and Pooling & Servicing Agreement. In addition, the value of the security must be discounted to account for the risk that a court may not recognize the trust as the legal owner of the security, and thus deny foreclosure on the collateral. The cost for the Trustee Bank Defendants to establish their trust is the owner of each mortgage included in the MBS is a financial harm to the U.S. government, as a purchaser of the MBS.

225.   Relator prepared a list of the trusts that have missing assignments and are using fabricated replacement assignments, as determined by an analysis of mortgage assignments conducted by Relator.  An earlier version of this list was provided by Relator on March 16, 2010, to the FBI Special Agent in Jacksonville, Florida, investigating the fraudulent mortgage assignments.

**(b)  Overcharges for fraudulent services and services not provided**

226.  Each of the Defendants named herein participates, or has participated, in MBS trusts that are missing lawful assignments from originating banks to the trusts, and has used forged instruments instead.  To proceed with foreclosure actions, the Defendants created fraudulent mortgage assignments and charged the MBS Trusts for the costs associated with the creation of these documents.  Likewise, Defendants charged the MBS Trusts for services that were never provided, including the custodial services related to notes and mortgage assignments.

227.  The distributions to the certificateholders, including the U.S. government are diminished by the servicing fees paid to the Mortgage Servicing Defendants for their unlawful services or for not providing any service. The cost paid for these services is a financial harm to the U.S. government, as certificateholder of the MBS.

**(c)  Fannie Mae and Freddie Mac**

228.  Both the Federal National Mortgage Association, Inc. ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") also paid the mortgage service defendants named herein millions of dollars in U.S. government funds to provide services involving mortgage assignments.  Fannie Mae and Freddie Mac are government-sponsored enterprises ("GSEs"), which are corporations with public purposes created by the U.S. government.  The primary purpose of Fannie Mae and Freddie Mac is to provide funding for the U.S. mortgage market by purchasing mortgages from banks and other direct lenders and packaging them, to ensure that adequate capital is available to banks and other financial institutions that lend money to home buyers.  The two entities provide funding for more than $6.3 trillion of the $11 trillion U.S. mortgage market.

229.   The U.S. government has invested substantial sums in MBS through financial support of its GSEs.  During the financial crisis, on September 7, 2008, Fannie Mae and Freddie Mac were essentially nationalized to avoid losses and provide financial stability to the mortgage market.  They were taken over by the U.S. government in a conservatorship.  Since that event, Fannie Mae and Freddie Mac have received nearly $145 billion in taxpayer support through the Treasury, divided as $83 billion to Fannie Mae and $61 billion to Freddie Mac, according to SEC filings and press releases.  At the time of the conservatorship, former Treasury Secretary Henry Paulson put a ceiling of $100 billion for investments in each company. But in February 2009, his successor, Timothy Geithner, raised the cap to $200 billion each. In December 2009, the Treasury said it would provide unlimited financial support to ensure the survival and liquidity of Fannie Mae and Freddie Mac for three years.

230.   Fannie Mae and Freddie Mac use mortgage servicing companies, including AHMS, WELLS/ASC, SAXON and LPS, and the Mortgage Servicing Defendants to service the loans that they acquire.

231.   As part of the services provided to Fannie Mae and Freddie Mac, AHMS, WELLS/ASC and SAXON and the Mortgage Servicing Defendants prepared and filed forged mortgage assignments throughout the United States, assigning mortgages to themselves, and bringing foreclosure actions in the names of the servicing companies.  In thousands of cases, the Mortgage Servicing Defendants used LPS, or attorneys hired by LPS, to prepare and file such assignments to the servicing companies.

232.   The assignments prepared and filed by the Mortgage Servicing Defendants were fraudulent.  The Defendants failed to obtain valid assignments when the loans were

purchased by Fannie Mae and Freddie Mac. The Mortgage Servicing Defendants then tried to secretly substitute "replacement" assignments. In hundreds of thousands of cases, these replacement assignments were defective for one or more of the following reasons:

(1) the individual or individuals signing as officers of the grantor were actually employees of the grantee servicing company;

(2) employees of the servicing companies often signed several thousand replacement assignments in a single week, at a pace that makes it obvious they did not review what they signed and completely disregarded the veracity of the information on such assignments, including the effective date of the transfer (stated on many such documents as 9/9/999); and

(3) to expedite the document production, employees of the servicing companies often signed each other's names and also forged the signature of the notary on such documents.

233.    The services of the Mortgage Servicing Defendants, actually provided to Fannie Mae and Freddie Mac, which were paid for with U.S. government funds, were fraudulent and illegal.

234.    In addition, Fannie Mae and Freddie Mac and other federal government agencies, including the U.S. Department of Housing and Urban Development, provide guarantees to lenders in the event that borrowers default on their mortgages. Each time a Defendant lacking valid notes and mortgage assignments submitted a claim for payment on such guarantee, said Defendant submitted a false claim for payment or approval. The U.S. government has been damaged to the extent that it has made payments on such guarantees.

**(d)    Federal Taxes From Trusts' Loss of Tax Status due to Assignments Made After the Date of Trust Formation**

235.    The most significant reason that trusts do not acquire loans after the closing date of the trust is that such actions may have negative tax consequences for the trusts. MBS trusts are created as Real Estate Mortgage Investment Conduits, or "REMICS" (a

76

type of special purpose vehicle used for the pooling of mortgage loans and issuance of mortgage-backed securities). REMICS are defined under the U.S. Internal Revenue Code (Tax Reform Act of 1986).

236.  The advantage of REMICS is that income from REMICS is tax exempt from double taxation. Because of the tax advantages, tax law limits and strictly regulates REMIC transactions. All contributions, *i.e.*, the delivery of the mortgage loans into the trust, to the REMIC must occur on the "start up date," or at most 90 days after this date, which is also the "cut-off date" specified in the MBS trust prospectus. All other contributions after the cut-off date are considered under the tax code as prohibited activities. Therefore, if a mortgage loan has not been identified by the cut-off date (*i.e.*, placed in the securitization pipeline by the originating bank), any transfer of the borrower's mortgage note and/or mortgage into the MBS trust after the cutoff date triggers a 100% penalty tax on the late contribution.

237.  Each of the Trustee Bank Defendants has assigned mortgages to their respective MBS trusts after the cut-off date, triggering taxes owed to the U.S. government, which remain unpaid.

## VIII. THE STATE OF NORTH CAROLINA PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM

238.  The State of North Carolina purchased over $1 billion of RMBS, according to the 2009 State Treasurer's annual report for the fiscal year 2008-2009.[15]

---

[15] The report is available at https://www.nctreasurer.com/NR/rdonlyres/DAD12892-8069-41F7-A36D-31EBF1776613/0/DepartmetofStateTreasurer2009AnnualReport.pdf.

239.   Each of the Defendants named herein participates, or has participated, in MBS trusts that are missing lawful assignments from originating banks to the trusts, and has used forged instruments instead.  To date, the Defendants had not disclosed to investors, including the State of North Carolina, that the trust assets were severely impaired because of the forged and fraudulent assignments.

240.   In any foreclosures on assets in the trust, the Trustee Bank Defendants will be unable, or will have to expend significant funds, to prove their allegations that the trust is the lawful owner of the subject mortgage, in addition to expenses due to the filing of forged assignments.  The amount the Trustee Bank Defendants will expend to prove their ownership is materially more than they would have spent if they had complied with the procedures described in the respective prospectus and Pooling & Servicing Agreement. In addition, the value of the security must be discounted to account for the risk that a court may not recognize the trust as the legal owner of the security, and thus deny foreclosure on the collateral. The cost for the Trustee Bank Defendants to establish their trust is the owner of each mortgage included in the MBS is a financial harm to the State of North Carolina, as a purchaser of the MBS.

241.   The State of North Carolina purchased RMBS including forged or fraudulent assignment at inflated value because the Defendants misrepresented to the State of North Carolina their compliance with the Prospectuses and related documentation.

242.   Furthermore, the State of North Carolina suffered financial harm caused by each payment to the Defendants for creating false assignments or for services that were

never provided, including the custodial services related to notes and mortgage assignments.

243.  The distributions to the certificateholders, including the State of North Carolina are diminished by the servicing fees paid to the Mortgage Servicing Defendants for their unlawful services or for not providing any service. The cost paid for these services is a financial harm to the State of North Carolina, as certificateholder of the MBS.

## IX.  THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, HAWAII, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, RHODE ISLAND, VIRGINIA, DISTRICT OF COLUMBIA, THE CITY OF CHICAGO AND THE CITY OF NEW YORK PURCHASED MORTGAGE-BACKED SECURITIES MADE UP OF MORTGAGES WITH MISSING OR FORGED ASSIGNMENTS FROM ORIGINATING BANKS TO THE SECURITIES TRUSTS SUFFERING SUBSTANTIAL FINANCIAL HARM

244.  The quarterly report on the State of California pooled money investment account for the quarter ending March 31, 2009 shows that the State of California purchased RMBS, valued at that date over $1 billion. The report for the following quarter indicated that the State of California still held the RMBS, valued less than $1 billion at the time.[16]

245.  The State of New Jersey also invested in RMBS, as indicated in the memorandum to the State Investment Council in May 2008. [17]

246.  The State of New Mexico invested in RMBS, as indicated in the State Investment Council's minutes of 2008.[17]

---

[16] *See* http://www.treasurer.ca.gov/pmia-laif/reports/quarterly/200903.pdf and *http://www.treasurer.ca.gov/pmia-laif/reports/quarterly/200906.pdf*.
[17] *See http://www.state.nj.us/treasury/doinvest/pdf/Real%20Estate%20Investment%20Presented%2005-08.pdf*.
[17] *See* http://www.sic.state.nm.us/PDF%20files/52708_SIC_Index_Minutes_Final.pdf.

247.   Upon information and belief,  the States of Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York also purchased securities issued by MBS Trusts with missing mortgage assignments.

248.   Each of the Defendants named herein participates, or has participated, in MBS trusts that are missing lawful assignments from originating banks to the trusts, and has used forged instruments instead.  To date, the Defendants had not disclosed to investors, including the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York that the trust assets were severely impaired because of the forged and fraudulent assignments.

249.   In any foreclosures on assets in the trust, the Trustee Bank Defendants will be unable, or will have to expend significant funds, to prove their allegations that the trust is the lawful owner of the subject mortgage, in addition to expenses due to the filing of forged assignments.  The amount the Trustee Bank Defendants will expend to prove their ownership is materially more than they would have spent if they had complied with the procedures described in the respective prospectus and Pooling & Servicing Agreement. In addition, the value of the security must be discounted to account for the risk that a court may not recognize the trust as the legal owner of the security, and thus deny foreclosure on the collateral. The cost for the Trustee Bank Defendants to establish their trust is the owner of each mortgage included in the MBS is a financial harm to the States

of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York as purchasers of the MBS.

250.  The States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York purchased RMBS including forged or fraudulent assignment at inflated value because the Defendants misrepresented to the States their compliance with the Prospectuses and related documentation.

251.  Furthermore, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York suffered financial harm caused by each payment to the Defendants for creating false assignments or for services that were never provided, including the custodial services related to notes and mortgage assignments.

252.  The distributions to the certificateholders, including the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, District of Columbia, the City of Chicago and the City of New York are diminished by the servicing fees paid to the Mortgage Servicing Defendants for their unlawful services or for not providing any service. The cost paid for these services is a financial harm to the States of California, Delaware, District of Columbia, Florida,

Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Rhode Island, Virginia, the City of Chicago and the City of New York as certificateholders of the MBS.

## X.    CAUSES OF ACTION

### COUNT I
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[18]
### Against
### The Trustee Bank Defendants, the Depositor Defendants, Aurora, BAC, Bayview, CRC, Carrington, Citimortgage, Barclays, HSBC Mortgage, Litton Loan, NTC, Ocwen, Orion, Prommis, SCI, Select Portfolio, Vericrest, WELLS/ASC

253. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

254. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

255. As alleged in paragraphs 1-252, the Defendants created, sold or participated in mortgage-backed securities.

256. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

---

[18] To the extent wrongdoing occurred prior to May 6, 2009, this Complaint should be deemed to include violations of the FCA prior to recent amendments to that statute, *e.g.*, 31 U.S.C. § 37290(a)(1), (a)(2), (a)(3), (a)(4) and (a)(7).

257. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the Treasury, or other entity funded by the U.S. government, violated state and federal laws and furthered an effort to transfer impaired securities to the Treasury, or other government funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the Treasury, or other government funded entity impaired securities. Defendants received millions of dollars in U.S. government funds to provide services involving fraudulent mortgage assignments or received payments on federal government guarantees of mortgages. Defendants falsely represented, in connection with submitting claims on mortgage guarantees, that they held good title to the notes and mortgages. Accordingly, the Defendants and their agents and employees knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the government entity purchasing the mortgage-backed securities or being asked to make a payment pursuant to a mortgage guarantee.

258. The United States, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been paid.

259. By reason of the payments and approvals, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT II
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### Against
### The Trustee Bank Defendants, the Depositor Defendants, Aurora, BAC, Bayview, CRC, Carrington, Citimortgage, Barclays, HSBC Mortgage, Litton Loan, NTC, Ocwen, Orion, Prommis, SCI, Select Portfolio, Vericrest, WELLS/ASC

260. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

261. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

262. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

263. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

264. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the Treasury, or other government funded entity, violated state and federal laws and furthered an effort to transfer impaired securities to the Treasury, or other government funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the Treasury, or other

84

government funded entity impaired securities. Defendants received millions of dollars in U.S. government funds to provide services involving fraudulent mortgage assignments or received payments on federal government guarantees of mortgages. Defendants falsely represented, in connection with submitting claims on mortgage guarantees, that they held good title to the notes and mortgages. In connection with the submission of these claims in the sale of the mortgage-backed securities to the government, or government funded entity, each of the Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the Treasury, or other U.S. government funded entity purchasing mortgage-backed securities or being asked to make a payment pursuant to a mortgage guarantee.

265. The United States, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been paid.

266. By reason of the payments and approvals, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

### COUNT III
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(D)
### Against all Defendants

267. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

268. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

269. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

270. As further alleged in paragraphs 1-252, the MBS Trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

271. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

272. By virtue of the wrongful conduct alleged here including, but not limited to, the creation of false mortgage assignments and payments for services that were never provided, each of the Defendants had possession, custody or control of property or money used, or to be used by the Government and knowingly delivered, or caused to be delivered to the U.S. government, investor in the MBS Trusts, less than all of that money or property.

273. By reason of this unlawful conduct, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT IV
## Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### Against all Defendants

274. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

275. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

276. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

277. As further alleged in paragraphs 1-252, the Defendants that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

278. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services related to the notes and mortgage assignments.

279. By virtue of the wrongful conduct alleged here including, but not limited to, the creation of false mortgage assignments, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

280. By reason of this unlawful conduct, the United States has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT V**
**Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Against**
**The Trustee Bank Defendants, the Depositor Defendants, Aurora, BAC, Bayview, CRC, Carrington, Citimortgage, Barclays, HSBC Mortgage, Litton Loan, NTC, Ocwen, Orion, Prommis, SCI, Select Portfolio, Vericrest, WELLS/ASC**
**For conspiracy to commit a violation of violation of**
**31 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(B)**
**And against all Defendants for conspiracy to commit a violation of**
**§ 3729(a)(1)(D), and § 3729(a)(1)(G).**

281. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

282. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

283. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

284. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

285. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, Defendants conspired to violate state and federal laws and furthered an effort to transfer impaired securities to the Treasury, or other government funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the Treasury, or other government funded entity. Each of the mortgage-backed securities sold to the Treasury, or other government funded entity, was in violation of state and federal law. Defendants acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody or control to the U.S. government. Defendants acted in concert to make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the U.S. government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the U.S. government.

286. Through the conduct set forth above, Defendants conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), § 3729(a)(1)(D), and § 3729(a)(1)(G).

## COUNT VI
## North Carolina False Claims Act,
## N.C. Gen. Stat. §§ 1-607(a)(1)-(a)(4),1-607 (a)(7)
## Against all Defendants

287. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

288. This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*.

289. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

290. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

291. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

292. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-

backed securities sold to the State of North Carolina, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of North Carolina, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of North Carolina, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of North Carolina to pay claims that are false or fraudulent. Defendants  knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the state entity purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the State of North Carolina, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the North Carolina False Claims Act and furthered an effort to transfer impaired securities to the State of North Carolina, or other State funded entity.  Each of the Defendants had possession, custody or control of property or money used, or to be used by the State and knowingly delivered, or caused to be delivered to the State of North Carolina, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets,

91

thus impairing the value of the securities sold to the State of North Carolina, or other state funded entity. Each of the mortgage-backed securities sold to the State of North Carolina, or other state funded entity, was in violation of law. Defendants further acted in concert to deliver, or cause to be delivered, less money or property, of which they had possession, custody or control to the State, or state-funded entity. Defendants acted in concert to knowingly make, use, or cause to be made or use, false records or statements material to an obligation to pay or transmit money or property to the State, or state funded entity or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State or state funded entity.

293. The State of North Carolina, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

294. By reason of the payments and approvals, the State of North Carolina has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT VII
### California False Claims Act,
### Cal. Govt. Code §§ 12651(a)(1)- (a)(4), 12651(a)(7)-(a)(8)
### Against all Defendants

295. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

296. This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov.t Code § 12650 *et seq.*.

297. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

298. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

299. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

300. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of California, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of California, or other state funded entity impaired securities.  In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of California, or state funded entity, each

of the Defendants knowingly caused, or assisted in causing, the State of California to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the state entity purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the State of California, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the California False Claims Act and furthered an effort to transfer impaired securities to the State of California, or other State funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of California, or other state funded entity. Each of the mortgage-backed securities sold to the State of California, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of public property or money used, or to be used by the State and knowingly delivered, or caused to be delivered to the State of California, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State or state funded entity. Defendants conspired to commit a violation of the California False Claims Act and furthered an effort to transfer impaired securities to the State of California, or other State funded entity. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

301. The State of California, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

302. By reason of the payments and approvals, the State of California has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT VIII**
**Delaware False Claims Act,**
**Del. Code Ann. Tit. 6,§§ 1201(a)(1)-(a)(4),1201(a)(7)**
**Against all Defendants**

303. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

304. This is a claim for treble damages and civil penalties under the Delaware False Claims Act, Del. Code Ann. Tit. 6, § 1201 *et seq.*.

305. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

306. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

307. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services.

Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

308. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Delaware, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Delaware, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Delaware, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Delaware to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the state entity purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, directly or indirectly, false records or statements material to false or fraudulent claims to the State of Delaware, or other state funded entity purchasing mortgage-backed securities. Each of the Defendants had possession, custody or control of property or money used, or to be used by the State and, intending to defraud it delivered, or caused to be delivered to the State of Delaware, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State. Defendants

conspired to commit a violation of the Delaware False Claims Act and furthered an effort to transfer impaired securities to the State of Delaware, or other State funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Delaware, or other state funded entity. Each of the mortgage-backed securities sold to the State of Delaware, or other state funded entity, was in violation of law.

309. The State of Delaware, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

310. By reason of the payments and approvals, the State of Delaware has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT IX**
**District of Columbia False Claims Act,**
**D.C. Code Ann. §§ 2-308.14 (a)(1)-(a)(4),2-308.14 (a)(7)-(a)(8)**
**Against all Defendants**

311. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

312. This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, DC. Code Ann. § 2-308.14 *et seq.*.

313. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

314. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating

97

bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

315. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

316. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the District of Columbia, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the District of Columbia, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the District of Columbia, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, District of Columbia to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the district purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims

paid or approved by the District of Columbia, or other state funded entity purchasing mortgage-backed securities.. Defendants conspired to commit a violation of the District of Columbia False Claims Act and furthered an effort to transfer impaired securities to the District of Columbia, or other District funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the District of Columbia, or other state funded entity. Each of the mortgage-backed securities sold to the District of Columbia, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by the District and knowingly delivered, or caused to be delivered to the District, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the District. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the District within a reasonable time.

317. The District of Columbia, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

318. By reason of the payments and approvals, the District of Columbia has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT X**
**Florida False Claims Act,**
**Fla. Stat. Ann. §§ 68.082(2)(a)-(2)(d),68.081 (2)(g)**
**Against all Defendants**

319. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

320. This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*.

321. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

322. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

323. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

324. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-

100

backed securities sold to the State of Florida, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Florida, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Florida, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of Florida to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the agency purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Florida False Claims Act and furthered an effort to transfer impaired securities to the State of Florida, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Florida, or other state funded entity. Each of the mortgage-backed securities sold to the State of Florida, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by a state agency and, intending to deceive the agency or knowingly conceal the property, delivered or caused to be delivered less than all of that money or property. The Defendants knowingly made,

used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to a State agency.

325. The State of Florida, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

326. By reason of the payments and approvals, the State of Florida has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XI**
**Hawaii False Claims Act,**
**Haw. Rev. Stat. §§ 661-21(a)(1)-(a)(4), 661-21(a)(7)-(a)(8)**
**Against all Defendants**

327. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

328. This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*.

329. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

330. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities. Defendants created false mortgage assignments and

102

charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services related to the notes and mortgage assignments.

331. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Hawaii, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Hawaii, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Hawaii, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Hawaii to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Hawaii False Claims Act and furthered an effort to transfer impaired securities to the State of Hawaii, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Hawaii, or other state funded entity. Each of the mortgage-backed securities sold to the State of Hawaii, or other state funded

entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by the State and, intending to defraud the State, delivered or caused to be delivered less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State of Hawaii. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

332. The State of Hawaii, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

333. By reason of the payments and approvals, the State of Hawaii has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XII**
**Illinois Whistleblower Reward and Protection Act,**
**740 Ill. Comp. Stat. §§175/3 (a)(1)-(a)(4),175/3 (a)-(7)**
**Against all Defendants**

334. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

335. This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*.

336. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

337. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security

that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

338. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services related to the notes and mortgage assignments.

339. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Illinois, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Illinois, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Illinois, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Illinois to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be

made or used, false records or statements material to false or fraudulent claims paid or approved by the State of Illinois, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Illinois Whistleblower Reward and Protection Act, and furthered an effort to transfer impaired securities to the State of Illinois, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Illinois, or other state funded entity. Each of the mortgage-backed securities sold to the State of Illinois, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by the State and, intending to defraud the State, delivered or caused to be delivered less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State of Illinois.

340. The State of Illinois, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

341. By reason of the payments and approvals, the State of Illinois has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XIII
### Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-2(b)(1)-(b)(4), 5-11-5.5-2(b)(7) Against all Defendants

342. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

106

343. This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

344. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

345. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

346. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

347. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Indiana, violated state and federal laws and furthered an effort to transfer impaired securities to the State, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Indiana, or other state funded entity

107

impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Indiana, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Indiana to pay claims that are false or fraudulent. Defendants knowingly presented a false or fraudulent claim for payment or approval from the State purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to obtain payment or approval of false or fraudulent claims by the State of Indiana, or other state funded entity purchasing mortgage-backed securities. Each of the Defendants with intent to defraud the State delivered less money or property to the State of Indiana, investor in the MBS Trusts. The Defendants knowingly made or used a false record or statement to avoid an obligation to pay or transmit money or property to the State. Defendants conspired to commit a violation of the Indiana False Claims and Whistleblower Protection Act, and furthered an effort to transfer impaired securities to the State of Indiana, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Indiana, or other state funded entity. Each of the mortgage-backed securities sold to the State of Indiana, or other state funded entity, was in violation of law. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Indiana, or other state funded entity. Each of the mortgage-backed securities sold to the State of Indiana, or other state funded entity, was in violation of law. Defendants further acted in concert to deliver, or cause to be delivered, less money or property to the State, or state-funded

entity. Defendants acted in concert to make or use false records or statements to avoid an obligation to pay or transmit money or property to the State, or state funded entity.

348. The State of Indiana, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

349. By reason of the payments and approvals, the State of Indiana has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XIV**
**Massachusetts False Claims Act,**
**Mass. Ann. Laws Ch. 12, §§ 5(B)(1)-(B)(4),5(B)(8)**
**Against all Defendants**

350. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

351. This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(0).

352. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

353. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

354. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

355. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the Commonwealth of Massachusetts, violated state and federal laws and furthered an effort to transfer impaired securities to the Commonwealth of Massachusetts, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the Commonwealth of Massachusetts, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the Commonwealth of Massachusetts, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, Commonwealth of Massachusetts to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the Commonwealth of Massachusetts purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to obtain payment or approval of false or fraudulent claims by the Commonwealth of Massachusetts, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Massachusetts False Claims Act, and furthered an effort to transfer impaired securities to the

110

Commonwealth of Massachusetts, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the Commonwealth of Massachusetts, or other state funded entity. Each of the mortgage-backed securities sold to the Commonwealth of Massachusetts or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by the Commonwealth and knowingly delivered, or caused to be delivered to the Commonwealth, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Commonwealth. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the Commonwealth within a reasonable time.

356. The Commonwealth of Massachusetts, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

357. By reason of the payments and approvals, the Commonwealth of Massachusetts has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XV
### Minnesota False Claims Act,
### Minn. Stat. §§ 15C.02(a)(1)-(a)(4),15C.02(a)(7)
### Against all Defendants

358. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

359. This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*.

360. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

361. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

362. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

363. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Minnesota, violated state and federal laws and furthered an effort to transfer impaired securities to the State of Minnesota, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Minnesota, or other state

funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Minnesota, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of Minnesota to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Minnesota purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to obtain false or fraudulent claims paid by the State of Minnesota, or other state funded entity purchasing mortgage-backed securities. Defendants knowingly conspired to commit a violation of the Minnesota False Claims Act, and furthered an effort to transfer impaired securities to the State of Minnesota, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Minnesota, or other state funded entity. Each of the mortgage-backed securities sold to the State of Minnesota or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used by the State and knowingly delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State.

364. The State of Minnesota, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

365. By reason of the payments and approvals, the State of Minnesota has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XVI**
**Montana False Claims Act,**
**Mont. Code Ann. §§ 17-8-403(1)(a)-(1)(d), 17-8-403(1)(g)-(h)**
**Against all Defendants**

366. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

367. This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*.

368. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

369. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

370. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services.

114

Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

371. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Montana, violated state and federal laws and furthered an effort to transfer impaired securities to the State of Montana, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Montana, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Montana, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of Montana, to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Montana, purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid by the State of Montana, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Montana False Claims Act, and furthered an effort to transfer impaired securities to the State of Montana, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Montana, or other state funded entity. Each of the mortgage-backed securities sold to the State of Montana, or other

state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of public property or money used, or to be used by the State and knowingly delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

372. The State of Montana, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

373. By reason of the payments and approvals, the State of Montana, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XVII
### Nevada False Claims Act,
### Nev. Rev. Stat. §§ 357.040 (1)(a)- (1)(d),357.040 (1)(g)-(1)(h)
### Against all Defendants

374. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

375. This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*.

376. As alleged in paragraphs 1-252 the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

377. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security

116

that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender.  The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

378. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

379. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Nevada, violated state and federal laws and furthered an effort to transfer impaired securities to the State of Nevada, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Nevada, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Nevada, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, the State of Nevada, to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of Nevada, purchasing the mortgage-backed securities. Defendants further knowingly made, used or

caused to be made or used, false records or statements to obtain payment or approval of false or fraudulent claims by the State of Nevada, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Nevada False Claims Act, and furthered an effort to transfer impaired securities to the State of Nevada, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of Nevada, or other state funded entity. Each of the mortgage-backed securities sold to the State of Nevada, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of public property or money and knowingly delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State. The Defendants benefited from the submission of false claims and, after discovering the falsity of the claim, failed to disclose the falsity to the State within a reasonable time.

380. The State of Nevada, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

381. By reason of the payments and approvals, the State of Nevada, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XVIII
### New Hampshire False Claims Act,
### N.H. Rev. Stat. Ann. § 167:61-b(I)(a)-(I)(f)
### Against all Defendants

382. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

383. This is a claim for treble damages and civil penalties under the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61 *et seq.*.

384. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

385. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

386. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

387. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-

backed securities sold to the State of New Hampshire, violated state and federal laws and furthered an effort to transfer impaired securities to the State of New Hampshire, or other state funded entity.  Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of New Hampshire, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of New Hampshire, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of New Hampshire, to pay claims that are false or fraudulent. Defendants  knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New Hampshire, purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Hampshire, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the New Hampshire False Claims Act,  and furthered an effort to transfer impaired securities to the State of New Hampshire, or other state funded entity.  Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of New Hampshire, or other state funded entity. Each of the mortgage-backed securities sold to the State of New Hampshire, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used, by the State and, intending to defraud the State delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants

120

knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State. Defendants benefited from the submission of false claims and when discovered the falsity of the claim failed to disclose the false claim to the State within a reasonable time after discovery of the false claim.

388. The State of New Hampshire, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

389. By reason of the payments and approvals, the State of New Hampshire, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XIX**
**New Jersey False Claims Act,**
**N.J. Stat. §§ 2A:32 C-3(a)- (d);2A:32 C-3(g)**
**Against all Defendants**

390. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

391. This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32 C-1 *et seq.*.

392. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

393. As further alleged in paragraphs 1-252 the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in

the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

394. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

395. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of New Jersey, violated state and federal laws and furthered an effort to transfer impaired securities to the State of New Jersey, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of New Jersey, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of New Jersey, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of New Jersey, to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New Jersey, purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or other state

funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the New Jersey False Claims Act, and furthered an effort to transfer impaired securities to the State of New Jersey, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of New Jersey, or other state funded entity. Each of the mortgage-backed securities sold to the State of New Jersey, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of public property or money used, or to be used, by the State and knowingly delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State.

396. The State of New Jersey, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

397. By reason of the payments and approvals, the State of New Jersey, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XX**
**New Mexico False Claims Act,**
**N.M. Stat. Ann. §§ 27-14-3 (A)(1)-(A)(4), 27-14-3(A)(7)-(A)(8)**
**Against all Defendants**

398. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

399. This is a claim for treble damages and civil penalties under the New Mexico False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*.

400. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

401. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

402. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

403. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of New Mexico, violated state and federal laws and furthered an effort to transfer impaired securities to the State of New Mexico, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of New Mexico, or other

state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of New Mexico, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of New Mexico, to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New Mexico, purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to obtain approval or payment on a false or fraudulent claims by the State of New Mexico, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the New Mexico False Claims Act, and furthered an effort to transfer impaired securities to the State of New Mexico, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the State of New Mexico, or other state funded entity. Each of the mortgage-backed securities sold to the State of New Mexico, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used, by the State and, knowingly delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State or benefited from the submission of a false claims and, having subsequently discovered the falsity of the claim, failed to disclose the false claim to the State within a reasonable time after discovery.

404. The State of New Mexico, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

405. By reason of the payments and approvals, the State of New Mexico, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**COUNT XXI**
**New York False Claims Act,**
**N.Y. State Fin. L. §§ 189.1.(a)-1.(d), 189.1.(g)**
**Against all Defendants**

406. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

407. This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. St. Fin. L. § 187 *et seq.*.

408. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

409. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

410. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

411. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of New York, violated state and federal laws and furthered an effort to transfer impaired securities to the State of New York, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of New York, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of New York, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of New York, to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the State of New York, purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the State of New York, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the New York False Claims Act, and furthered an effort to transfer impaired securities to the State of New York, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were

missing title to the assets, thus impairing the value of the securities sold to the State of New York, or other state funded entity. Each of the mortgage-backed securities sold to the State of New York, or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used, by the State and, intending to defraud the state or a local government, delivered, or caused to be delivered to the State, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State or state funded entity.

412. The State of New York, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

413. By reason of the payments and approvals, the State of New York, has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XXII
### Rhode Island False Claims Act,
### R.I. Gen. Laws§§ 9-1.1-3(a)(1)-(a)(4), 9-1.1-3(a)(7)
### Against all Defendants

414. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

415. This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-1 *et seq.*.

416. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

417. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

418. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

419. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the State of Rhode Island, violated state and federal laws and furthered an effort to transfer impaired securities to the State of Rhode Island, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the State of Rhode Island, or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the State of Rhode Island, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, State of Rhode Island, to pay claims that are false or fraudulent. Defendants knowingly

presented or caused to be presented a false or fraudulent claim for payment or approval

from the State of Rhode Island, purchasing the mortgage-backed securities. Defendants

further knowingly made, used or caused to be made or used, false records or statements

to get false or fraudulent claims paid or approved by the State of Rhode Island, or other

state funded entity purchasing mortgage-backed securities. Defendants conspired to

commit a violation of the Rhode Island False Claims Act, and furthered an effort to

transfer impaired securities to the State of Rhode Island, or other state funded entity.

Defendants acted in concert to create fraudulent legal documentation to conceal that the

trusts were missing title to the assets, thus impairing the value of the securities sold to

the State of Rhode Island, or other state funded entity. Each of the mortgage-backed

securities sold to the State of Rhode Island, or other state funded entity, was in violation

of law. Each of the Defendants had possession, custody or control of property or money

used, or to be used, by the State and, intending to defraud the State, delivered, or caused

to be delivered, to the State, investor in the MBS Trusts, less than all of that money or

property. The Defendants knowingly made, used, or caused to be made or used, a false

record or statement to conceal, avoid or decrease an obligation to pay or transmit money

or property to the State.

420. The State of Rhode Island, unaware of the falsity or fraudulent nature of the

claims made by the Defendants, approved, paid and participated in payments made for

claims that otherwise would not have been paid.

421. By reason of the payments and approvals, the State of Rhode Island, has

been damaged, and possibly continues to be damaged, in an amount yet to be

determined.

**COUNT XXIII**
**Virginia Fraud Against Taxpayers Act,**
**Va. Code Ann. §§ 8.01-216.3 (A)(1)- (A-4), 8.01-216.3 (A)(7)**
**Against all Defendants**

422. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

423. This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216 *et seq.*.

424. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

425. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

426. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

427. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-

backed securities sold to the Commonwealth of Virginia, violated state and federal laws and furthered an effort to transfer impaired securities to the Commonwealth of Virginia, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the Commonwealth of Virginia or other state funded entity impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the Commonwealth of Virginia, or state funded entity, each of the Defendants knowingly caused, or assisted in causing, Commonwealth of Virginia to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the Commonwealth of Virginia purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or other state funded entity purchasing mortgage-backed securities. Defendants conspired to commit a violation of the Virginia Fraud Against Taxpayers Act, and furthered an effort to transfer impaired securities to the Commonwealth of Virginia, or other state funded entity. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the Commonwealth of Virginia, or other state funded entity. Each of the mortgage-backed securities sold to the Commonwealth of Virginia or other state funded entity, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used, by the Commonwealth and, intending to defraud the Commonwealth, delivered, or caused to be delivered, to the Commonwealth, investor in

132

the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Commonwealth.

428. The Commonwealth of Virginia, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

429. By reason of the payments and approvals, the Commonwealth of Virginia has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XXIV
### City of Chicago False Claims Act,
### Chicago Code of Ordinances §§ 1-22-020(1)-(4), 1-22-020(7)
### Against all Defendants

430. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

431. This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act, Chicago Mun. Code § 1-22 *et seq.*

432. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

433. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and

other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

434. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

435. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the City of Chicago, violated state and federal laws and furthered an effort to transfer impaired securities to the City of Chicago, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the City of Chicago impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the City of Chicago, each of the Defendants knowingly caused, or assisted in causing, the City of Chicago to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval from the City of Chicago purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the City of Chicago purchasing mortgage-backed securities. Defendants conspired to commit a violation of the City of Chicago False Claims Act, and furthered an effort to transfer impaired securities to the City of Chicago. Defendants acted in concert to create fraudulent legal

documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the City of Chicago. Each of the mortgage-backed securities sold to the City of Chicago, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used, by the City of Chicago and, intending to defraud the City of Chicago, delivered, or caused to be delivered, to the City of Chicago, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City of Chicago.

436. The City of Chicago, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

437. By reason of the payments and approvals, the City of Chicago has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## COUNT XXV
### New York City False Claims Act,
### NYC Admin. Code §§ 7-803 (a)(1)-(a)(4), 7-803 (a)(7)
### Against all Defendants

438. Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 252 of this Complaint.

439. This is a claim for treble damages and civil penalties under the City of New York False Claims Act, NYC Admin. Code § 7-803.

440. As alleged in paragraphs 1-252, the Defendants, and each of them, created, sold or participated in mortgage-backed securities.

135

441. As further alleged in paragraphs 1-252, the trusts that issued mortgage-backed securities lacked the requisites necessary for the securities to have the security that was represented namely: (1) the legally binding assignments from the originating bank to the securities trust and, finally, to the foreclosure agent; (2) recording of title in the county recorder's office; and (3) original note and mortgage, signed by both borrower and lender. The prospectus for each mortgage-backed securities trust, and other public statements, falsely represented that the trust held good title to the mortgages and notes underlying the securities.

442. As further alleged in paragraphs 1-252, the Defendants created false mortgage assignments and charged the MBS Trusts for their unlawful services. Likewise, the Defendants charged the MBS Trusts for services that were never provided, including, but not limited to, custodial services relating to the notes and mortgage assignments.

443. By virtue of the wrongful conduct alleged here including, but not limited to, the false signatures used in manufactured mortgage assignments, each of the mortgage-backed securities sold to the City of New York, violated state and federal laws and furthered an effort to transfer impaired securities to the City of New York, or other state funded entity. Defendants and their agents and employees falsely represented that they held good title to the MBS assets and sold to the City of New York impaired securities. In connection with the submission of these claims in the sale of the mortgage-backed securities to the City of New York, each of the Defendants knowingly caused, or assisted in causing, the City of New York to pay claims that are false or fraudulent. Defendants knowingly presented or caused to be presented a false or fraudulent claim

136

for payment or approval from the City of New York purchasing the mortgage-backed securities. Defendants further knowingly made, used or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the City of New York purchasing mortgage-backed securities. Defendants conspired to commit a violation of the City of New York False Claims Act, and furthered an effort to transfer impaired securities to the City of New York. Defendants acted in concert to create fraudulent legal documentation to conceal that the trusts were missing title to the assets, thus impairing the value of the securities sold to the City of New York. Each of the mortgage-backed securities sold to the City of New York, was in violation of law. Each of the Defendants had possession, custody or control of property or money used, or to be used, by the City of New York and, intending to defraud the City of New York, delivered, or caused to be delivered, to the City of New York, investor in the MBS Trusts, less than all of that money or property. The Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City of New York.

444. The City of New York, unaware of the falsity or fraudulent nature of the claims made by the Defendants, approved, paid and participated in payments made for claims that otherwise would not have been paid.

445. By reason of the payments and approvals, the City of New York has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

## XI.     PRAYER FOR RELIEF

**WHEREFORE**, Relator requests that judgment be entered against Defendants, ordering that:

a.     Defendants pay an amount equal to three times the amount of damages the United States and the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Oklahoma, Rhode Island, Virginia, the State of North Carolina, District of Columbia, the City of Chicago and the City of New York have sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,000, and not more than $10,000 for each violation of 31 U.S.C. § 3729 and for each violation of N.C. Gen. Stat. § 1-605 *et seq.* and similar provisions of the State False Claims Acts, of the City of Chicago False Claims Act and City of New York False Claims Act;

b.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), pursuant to N.C. Gen. Stat. § 1-610 and similar provisions of the State False Claims Acts, of the City of Chicago False Claims Act and City of New York False Claims Act;

c.     Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d), pursuant to N.C. Gen. Stat. § 1-610 and similar provisions of the State False Claims Acts, of the City of Chicago False Claims Act and City of New York False Claims Act;

d.     The United States, the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Oklahoma, Rhode Island, Virginia, the State of North Carolina, District of Columbia, the City of Chicago and City of New York and Relator be granted all such other relief afforded by law as the Court deems appropriate;

138

## XII.   REQUEST FOR A TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator

hereby demands a trial by jury.

Dated: June 28, 2011

**RICHARD A. HARPOOTLIAN P.A.**
Richard A. Harpootlian, Esq.*(pro hac vice*
to be sought)
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone:   (803) 252-4848
Facsimile:   (803) 252-4810

William K. Diehl, Jr.
**JAMES, MCELROY & DIEHL, P.A.**
600 South College Street
Charlotte, North Carolina 28202
Telephone:  (704)372-9870
Facsimile:  (704)333-5508

**JANET, JENNER & SUGGS, LLC**
Howard Janet, Esq. .*(pro hac vice* to be
sought)
Woodholme Center
1829 Reisterstown Road, Suite 320
Baltimore, MD 21208
Telephone:   (410) 653-3200
Facsimile:   (410) 653-9030

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer, Esq. *(pro hac vice* to be
sought)
James J. Sabella, Esq.*(pro hac vice* to be
sought)
Lydia Ferrarese, Esq. .*(pro hac vice* to be
sought)
485 Lexington Avenue
New York, NY 10017
Telephone:   (646) 722-8500
Facsimile:   (646) 722-8501

**JANET, JENNER & SUGGS, LLC**
Kenneth M. Suggs, Esq. *(pro hac vice* to
be sought)
500 Taylor Street
Columbia, SC 29201
Telephone:   (803)- 726-0050
Facsimile:   (410) 653-9030

**GRANT & EISENHOFER P.A.**
Reuben Guttman, Esq. .*(pro hac vice* to be
sought)
1920 L Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:   (202) 386-9500
Facsimile:   (202) 350-5908

Attorneys for Qui Tam Plaintiff Lynn E. Szymoniak

## CERTIFICATE OF SERVICE

On June 28, 2011, I hereby certify that a copy of the Relator's Second Amended Complaint, Filed Under Seal (file stamped) will be served promptly on the persons listed below after Relator's Counsel receives a file-stamped copy of this document from the Court and in accordance with the Federal False Claims Act, the State False Claims Acts and the Fed. R. Civ. P. 4.

William K. Diehl, Jr.
**JAMES, MCELROY & DIEHL, P.A.**
600 South College Street
Charlotte, North Carolina 28202
Telephone: (704)372-9870
Facsimile:  (704)333-5508

**VIA FIRST CLASS MAIL**
**RETURN RECEIPT REQUESTED**

United States Attorney General Eric H. Holder
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Tel.: (202) 514-2001

United States Attorney General Eric H. Holder
**c/o Ms. Joyce R. Branda**
Deputy Director
Commercial Litigation Branch
Civil Fraud
U.S. Department of Justice
601 D Street, NW
Washington, DC 20530
Tel.: (202) 307-0231
Fax: (202) 616-3085

André Birotte, Jr.
United States Attorney
**c/o George S. Cardona**
First Assistant United States Attorney
Central District of California
1200 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Tel.: (213) 894-6947

Deputy Attorney General Nicklas A. Akers
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Tel.: (415) 703-5500
Fax: (415) 703-5480
nicklas.akers@doj.ca.gov

Brian McCabe
Commercial Litigation Branch
Civil Division – Fraud Section
Patrick Henry Building, Room 9915
601 D Street, NW
Washington, DC 20002

Attorney General Irvin B. Nathan
Office of the Attorney General
441 4th Street, NW
Suite 1100S
Washington, DC 20001
Tel.: (202) 727-3400
Fax: (202) 347-8922

Attorney General Bill McCollum
Office of the Attorney General of Florida
PL-01 The Capitol
Tallahassee, FL 32399-1050
Tel.: (850) 414-3300
Fax: (487)487-9475
Ag.mccollum@myfloridalegal.com

Mr. Alex Sink, Chief Financial Officer
c/o Mr. Pete Dunbar
Division of Legal Services
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL 32399
Tel.: (850) 413-3110
Fax: (850) 413-7460

Mara S. Georges, Corporation Counsel
City of Chicago, Law Department
121 North LaSalle Street, Room 600
Chicago, IL 60602
Tel.: (312) 744-0220
Fax: (312) 744-8538

Attorney General Joseph R. Biden, III
Delaware Attorney General's Office
Carvel State Office Building
820 N. French Street
Wilmington, DE 19801
Tel.: (302) 577-8512
Fax: (302) 577-2496

William Edgar
Trial Attorney (Fraud)
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-001
Tel: 202-353-7950
Email: william.edgar@usdoj.gov

Russell S. Kent, Esquire
Special Counsel for Litigation
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
Tel: (850) 414-3854
Cell: (850) 728-6821
Fax: (850) 488-9134
Russell.Kent@myfloridalegal.com

Attorney General David Louie
Michael S. Vincent
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813
Tel.: (808) 586-1500
Fax: (808) 586-1239

Attorney General Lisa Madigan
Malini Rao
Office of the Attorney General
Chicago Main Office
100 West Randolph Street
Chicago, IL 60601
Tel.: (312) 814-3000
Fax: (312) 814-3806

2

Miguel del Valle, City Clerk
City of Chicago
121 North LaSalle Street, Room 107
Chicago, IL 60602
(312) 742-5375
cityclerk@cityofchicago.org

Attorney General Greg Zoeller
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington Street
Indianapolis, IN 46204
Tel.: (317) 232-6201
Fax: (317) 232-7979
constituent@atg.in.gov

Attorney General Lori Swanson
Office of the Minnesota Attorney General
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101
(651) 296-3353

Attorney General Catherine Cortez-Masto
Ernest Figueroa
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701
Tel.: (775) 684-1100
Fax: (775) 684-1108

Attorney General Paula T. Dow
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Tel.: (609) 292-8740
Fax: (609) 292-3508

Mr. Dave Thomas
Inspector General of Indiana
315 W. Ohio Street, Room 104
Indianapolis, IN 46204
Tel.: (317) 232-3850

Attorney General Martha Coakley
Peter Leight
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel.: (617) 727-2200
Fax: (617) 727-3251

Attorney General Steve Bullock
Department of Justice
215 North Sanders Street
Helena, MT 59620-1401
Tel.: (406) 444-2026
steve@stevebullock.com

Attorney General Michael A. Delaney
Karen Gorham
33 Capitol Street
Concord, NH 03301
Tel.: (603) 271-3658
Fax: (603) 271-2110

Attorney General Gary King
Seth Cohen
Office of the Attorney General
for New Mexico
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501
Tel.: (505) 827-6000
Fax: (505) 827-5826

3

New York City Office – Law Department
120 Broadway
New York, NY 10271
Tel.:(212) 416-8000

Attorney General Eric Schneiderman
Office of the Attorney General
Department of Law
The Capitol
Albany, NY 12224
(800) 771-7755
serveAG@oag.state.ny.us

Thomas Teige Carroll
Senior Counsel
Investor Protection Bureau
New York State Office of the Attorney General
120 Broadway
New York, NY 10271-0332

Attorney General Roy Cooper
North Carolina Department of Justice
114 West Edenton Street
Raleigh, NC 27602
Tel.: (919) 716-6400
Fax: (919) 716-6750

U.S. Attorney Anne M. Tompkins
U.S. Attorney's Office for the Western
District of North Carolina
227 West Trade Street,
Suite 1650
Charlotte, NC 28202

Attorney General E. Scott Pruitt
313 NE 21st Street
Oklahoma City, OK 73105
Tel.: (405) 521-3921

Attorney General Peter Kilmartin
Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel.: (401) 274-4400

James R. Lee, Esquire
Office of the Attorney General
150 South Main Street
Providence, RI 02903

Mr. Timothy J. Heaphy
United States Attorney for the
Western District of Virginia
c/o Mr. Rick Mountcastle, AUSA
310 First Street, SW, Room 906
Roanoke, VA 24011
Tel.: (540) 857-2250
Fax: (540) 857-2614

Attorney General Kenneth T. Cuccinelli, II
c/o Ms. Erica Bailey
Assistant Attorney General
900 East Main Street
Richmond, VA 23219
Tel.: (804) 786-2071

Special Agent Richard Deer
U.S. Department of Labor
Office of Inspector General
   Office of Labor Racketeering and
   Fraud Investigations
BB&T Bank Building, Suite 410
310 1st Street, SW
Roanoke, VA 24011

Fran Trapp
Assistant United States Attorney
District of South Carolina
1441 Main Street, Suite 500
Columbia, SC 29201

Bill Nettles
United States Attorney
District of South Carolina
1441 Main Street, Suite 500
Columbia, SC 29201

5